810 P.2d 1030

**K. Tom TRACY, Petitioner,**

v.

**The SUPERIOR COURT OF MARICOPA COUNTY and the Honorable Gregory Martin, a judge thereof, Respondents,**

**and**

**The NAVAJO NATION, aka the Navajo Tribe of Indians, Real Party in Interest.**

**No. CV–90–0407–SA.**

Supreme Court of Arizona,
En Banc.

April 23, 1991.

Rothstein, Daly, Donatelli & Hughes by Robert R. Rothstein, Richard Hughes, Mark H. Donatelli, Santa Fe, and Navajo Nation Department of Justice by Eric Dahlstrom, Deputy Atty. Gen., Window Rock, for real party in interest.

## OPINION

FELDMAN, Vice Chief Justice.

K. Tom Tracy (Tracy) and others who were joined as intervenors for purposes of this special action [1] (collectively petitioners) challenged the superior court's jurisdiction to issue orders compelling their attendance as witnesses in a criminal trial before the district court of the Navajo Nation. The court's order issued under Arizona's Uniform Act to Secure the Attendance of Witnesses From Without a State in Criminal Proceedings, A.R.S. §§ 13–4091 through 13–4096 (the Uniform Act).

Petitioners assert that the superior court judge erred in finding that the Navajo Nation is an entity recognized by the Uniform Act. Tracy also argues that he faces a risk of "undue hardship" under A.R.S. § 13–4092(B) in that he will be deprived of his constitutional privilege against self-incrimination if required to testify before the Navajo District Court. The other petitioners make similar claims based on their assumptions that the Navajo District Court will not recognize various professional privileges.

We accepted jurisdiction because this matter constitutes an issue of first impression in Arizona and involves the question of comity between our state and the separate, sovereign jurisdiction of the Navajo Nation, which is located in part within the geographical boundaries of Arizona. We have jurisdiction pursuant to article 6, § 5(1) of the Arizona Constitution and Rule 8(b), Ariz.R.P.Spec.Act., 17B A.R.S. After hearing argument, we denied relief, thus refusing to vacate the orders compelling attendance, and stated that this opinion would follow.

Sacks, Tierney & Kasen, P.A. by David C. Tierney, Paul G. Johnson, Phoenix, for petitioner.

Broening, Oberg & Woods by Jan E. Cleator, Phoenix, for intervenor Francis Duckworth.

Jones, Skelton & Hochuli by A. Melvin McDonald, Jr., Phoenix, for intervenor A. Melvin McDonald.

Stewart & McLean by Harry A. Stewart, Jr., Phoenix, for intervenor Joe Acosta.

1. In Arizona, relief formerly obtained by writs of prohibition, mandamus or certiorari is now obtained by "special action." Rule 1, Arizona Rules of Procedure for Special Actions, 17B A.R.S.

FACTS AND PROCEDURAL HISTORY

This case arises from the Navajo Nation's decision to prosecute its former Chairman, Peter MacDonald, Sr., and his son for crimes resulting from the "Big Boquillas" transaction, an alleged conspiracy between the MacDonalds and several non-Indian businessmen to buy land and then sell it to the Navajo Nation at a profit. The alleged conspiracy caused the tribe to lose several million dollars. After the basis for the charges was revealed during testimony before the Special Investigations Subcommittee of the United States Senate Select Committee on Indian Affairs (the Subcommittee), the Navajo Nation placed Chairman MacDonald on administrative leave and appointed a special prosecutor to investigate and then conduct the criminal proceedings.

Tracy was named during testimony before the Subcommittee as one of those involved in the Big Boquillas transaction. Brief of the Navajo Nation in Special Action Proceeding in the Supreme Court at 2. Aside from these allegations, Tracy does not dispute the fact that he is "a principal in Tracy Oil & Gas Co., Inc., which in February 1987 optioned the ... Big Boquillas Ranch in Northern Arizona for $26,250,-000 and then sold the Ranch on July 8, 1987 to the Navajo Nation for $33,400,000." Petition for Special Action at 5.

In October 1989, the special prosecutor filed three multi-count criminal complaints against the MacDonalds in Navajo District Court. One of these complaints concerns the Big Boquillas transaction. The Navajo District Court does not have jurisdiction to prosecute non-members of the Navajo tribe, even for crimes committed in Indian Country, so Tracy is not the subject of any pending or prospective tribal prosecution. See Duro v. Reina,[2] — U.S. —, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990) (Indian tribal courts may not prosecute non-members of the tribe); Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978) (Indian tribal courts may not prosecute non-Indians).

Anticipating the need for the testimony of several witnesses residing outside the Navajo Nation, the special prosecutor recommended that the Navajo Tribal Council enact the Uniform Act to Secure the Attendance of Witnesses From Without a State in Criminal Proceedings (Navajo Uniform Act). The provision, codified at 17 Navajo Trib.Code §§ 1970–1974, was duly enacted in September 1989.[3] Pursuant to the Navajo Uniform Act, Judge Yazzie of the Window Rock District Court of the Navajo Nation issued certificates seeking to compel the attendance of Tracy and other named Maricopa County residents at the Big Boquillas trial.

On August 27, 1990, after holding a hearing on the matter, an Arizona superior court judge signed orders compelling Tracy and others to appear as witnesses in the Big Boquillas trial. The judge found that the Navajo Nation is a "state" or "territory" within the meaning of the Uniform Act, that the Navajo Nation had enacted a reciprocal provision of the Uniform Act, and that the courts of the Navajo Nation are "courts of record" within the meaning of the Uniform Act. The Arizona court held, therefore, that it had jurisdiction to order an Arizona resident to testify before the Navajo District Court in criminal proceed-

2. Although Congress has suspended the enforcement of Duro until September 30, 1991, pending resolution of bills introduced in Congress that would permanently recognize the inherent jurisdiction of tribal courts over non-member Indians (see Dept. of Defense Appropriations Act, 1991, Pub.L. No. 101–511, 104 Stat. 1892 (1990)), the ultimate dispostition of this issue is not relevant to this case because Tracy, as a non-Indian, is not subject to the tribal court's criminal jurisdiction. See Oliphant v. Suquamish Tribe, 435 U.S. 191, 98 S.Ct. 1011 (1978).

3. The Navajo Uniform Act is substantially identical to Arizona's Uniform Act. The companion provisions of the Uniform Act enable a court, on a showing of materiality and necessity, (1) to compel witnesses who reside outside of its jurisdiction to attend and testify at a criminal proceeding or a prosecutorial investigation; and (2) to require a witness from within the state, on the application of a court of record in another jurisdiction that has enacted a reciprocal provision, to testify in the courts of that state or territory. The Uniform Act has been adopted by all fifty states, the District of Columbia, Puerto Rico, and the Virgin Islands. The Navajo Uniform Act differs from the Arizona version only in that it enumerates the Navajo Nation in its definition of what constitutes a state. 17 Navajo Trib.Code § 1970(2).

ings brought against a member of the Navajo tribe.

Tracy then sought special action relief in the court of appeals. The court declined to accept jurisdiction, a majority of the panel finding that the Navajo Nation may be considered a state or territory whose courts are covered by the Uniform Act:

[W]hile the Navajo nation might not have been intended to be included within those entities which would be recognized under the Uniform Act when originally adopted, the underlying rationale of the Uniform Act was to provide mutuality of access between the various jurisdictions of this country to facilitate the prosecution of criminal cases. In this regard, a majority of this court considers the Navajo Tribal Courts to now provide those safeguards and procedures recognized by courts of other states, including the constitutional protection against self-incrimination and the statutory privilege associated with attorney/accountant/client communication.

Order, October 16, 1990.

Tracy then filed a special action in this court, seeking to quash the superior court's orders. He presented the following issues for our consideration:

1. Whether the moving papers that the Navajo Nation presented to the superior court judge were defective.

2. Whether Tracy can be considered a "necessary and material witness," for purposes of the Uniform Act, in light of his intent to refuse to testify before the Navajo District Court.

3. Whether the superior court judge erred in ruling that the Navajo Nation is a state or territory within the meaning of the Uniform Act.

4. Whether Tracy and the other petitioners face undue hardship under A.R.S. § 13–4092(B) in that they will claim privileges that will not be recognized by the Navajo District Court and hence will risk being jailed unless they "waive those rights."

We find no basis to question the superior court judge's finding that the moving papers were adequately presented. We address the remaining three issues.

## DISCUSSION

### A. Materiality of Tracy's Testimony

■ Tracy argues that he cannot be a necessary and material witness given his intention to invoke the privilege against self-incrimination. The superior court judge disagreed. He correctly held Tracy's testimony necessary and material. A witness cannot circumvent the Uniform Act by claiming his *intent* to assert the privilege before the questions are actually posed in the proceeding to which the privilege will pertain. *See State v. Schreuder*, 712 P.2d 264, 274 (Utah 1985) (witness's claimed intention to invoke the fifth amendment privilege in the requesting court is not a ground for finding the testimony is not material). The privilege is a matter to be ruled on by the court conducting the trial. *In re Pitman*, 26 Misc.2d 332, 201 N.Y.S.2d 1000, 1002 (N.Y.Gen.Sess.1960) (where New York witness was compelled to appear in New Jersey criminal prosecution, questions about his privilege against self-incrimination would have to be determined in the New Jersey court, not in the New York court issuing the order). *See generally Thoresen v. Superior Court*, 11 Ariz.App. 62, 66–67, 461 P.2d 706, 710–11 (1969) (fifth amendment privilege does not prevent asking potentially incriminating questions, and it cannot be claimed in advance of questions actually propounded).

The role of the court issuing the subpoena is only to determine that the testimony of the witness, if given, would be material and necessary to the proceedings. *See* A.R.S. § 13–4092(B) ("If at a hearing the judge determines that the witness is material and necessary, ... he shall issue a summons.... In any such hearing the certificate shall be prima facie evidence of all the facts stated therein."). Accordingly, Tracy is a necessary and material witness despite his stated intention to invoke his privilege against self-incrimination.

### B. Is the Navajo Nation Within the Scope of Arizona's Uniform Act?

Arizona's Uniform Act provides that a judge may direct the witness to appear at a criminal proceeding in another state if a judge of a court of record in *any state* which by its laws has made provision for commanding persons within *that state* to attend and testify in this state certifies ... that there is a criminal prosecution pending in such court ... [and] that a person being within this state is a material witness in such prosecution....

A.R.S. § 13–4092(A) (emphasis added). The definitional section of the Uniform Act reads as follows:

In this article, unless the context otherwise requires:

\*    \*    \*    \*    \*    \*

"State" includes any territory of the United States and the District of Columbia.

A.R.S. § 13–4091(2). Thus, the validity of the superior court's order turns on whether the Navajo District Court is a court of record[4] of "any territory of the United States."

In *People v. Superior Court (Jans)*, the California Court of Appeal became the first and only court thus far to consider whether the Navajo Nation is a territory for purposes of the Uniform Act. 224 Cal.App.3d 1405, 274 Cal.Rptr. 586 (1990), *review denied* (Nov. 28, 1990). In a well-reasoned opinion that examined the purpose and policy behind the statute and the jurisdictional relationship between the tribes and the states, the court concluded that the Navajo Nation constitutes a territory for purposes of California's Uniform Act and that the superior court had jurisdiction to summon a California resident to appear as a witness in a criminal proceeding before the Navajo District Court. *Id.* 274 Cal.Rptr. at 590.

California's Uniform Act is substantially identical to Arizona's. Because we must construe Arizona's Uniform Act in light of our own state policies, however, and because Tracy has pointed to the fact that on a different issue a panel of our court of

appeals concluded that the term "territory" did not include Indian tribes, we undertake a thorough analysis of statute and case law to determine whether the Navajo Nation constitutes a territory for purposes of the Uniform Act.

### 1. *There is no Fixed Definition of Territory*

#### a. Various Interpretations of Territory

Arizona's Uniform Act defines state to include "any territory of the United States." Tracy argues that the language "any territory" comprehends only organized territories operating pursuant to congressional law and having a governor appointed by the president. *See, e.g., In re Lane*, 135 U.S. 443, 10 S.Ct. 760, 34 L.Ed. 219 (1890) (Oklahoma "Indian Territory," which had no organized executive, legislative, or judicial branch, was not a territory for purposes of federal criminal statute); *People ex rel. Kopel v. Bingham*, 211 U.S. 468, 475–76, 29 S.Ct. 190, 192, 53 L.Ed. 286 (1909) (Puerto Rico is a territory under *Lane* definition for purposes of extradition of fugitive criminal).

The *Bingham–Lane* definition of territory encompasses only organized territories that derive their power from Congress and is but *one* definition courts have given to territory. Significantly, this narrow and technical definition of territory originated at a time in this nation's history when the United States did not have the same relationship with various quasi-sovereign entities—*i.e.*, Guam, the Virgin Islands, the Canal Zone, American Samoa—that it has today, and indeed, before Puerto Rico attained its quasi-sovereign status as a commonwealth.

In cases since *Bingham* and *Lane*, the term territory has often been interpreted

---

**4.** We recognize the Navajo District Court as a court of record. *See infra* note 6, on the structure of the Navajo judicial system. In general, district courts are courts of record. *See State v. Pendergrass*, 215 Kan. 806, 528 P.2d 1190, 1192 (1974) (quoting *State v. Higby*, 210 Kan. 554, 502 P.2d 740 (1972)). The district courts of the Navajo Nation are comparable to those of other

jurisdictions (*see infra* note 6), as they keep a written record of the proceedings, have provision for appeal to the Navajo Supreme Court, and have the inherent powers of all such courts, *i.e.*, the power to fine and imprison for contempt. *See generally* 21 C.J.S. *Courts* § 4, at 12–13 (1990).

more broadly to serve the purposes of the statute or enactment under consideration. *See, e.g., United States v. Standard Oil,* 404 U.S. 558, 560, 92 S.Ct. 661, 662, 30 L.Ed.2d 713 (1972) (American Samoa is a territory for purposes of Sherman Act provision);[5] *Puerto Rico v. Shell Co.,* 302 U.S. 253, 258–59, 58 S.Ct. 167, 169–70, 82 L.Ed. 235 (1937) (whether Puerto Rico comes within a given congressional act depends upon the character and aim of the act; Puerto Rico is not a territory within reach of sixth and seventh amendments, but may be considered a territory for purposes of the Sherman Act); *Americana of Puerto Rico, Inc. v. Kaplus,* 368 F.2d 431 (3rd Cir.1966), *cert. denied,* 386 U.S. 943, 87 S.Ct. 977, 17 L.Ed.2d 874 (1967) (Puerto Rico is a territory for purposes of federal full faith and credit statute); *Securities & Exch. Comm'n v. Capital Growth Co.,* 391 F.Supp. 593 (S.D.N.Y.1974) (Puerto Rico is a territory for purposes of the Securities and Exchange Act of 1934); *Wolfe v. Au,* 67 Haw. 259, 686 P.2d 16 (1984) (Micronesia is a territory for purposes of the Uniform Criminal Extradition Act, even though it is destined for nationhood rather than statehood); *cf. Garcia v. Friesecke,* 597 F.2d 284 (1st Cir.1979), *cert. denied,* 444 U.S. 940, 100 S.Ct. 292, 62 L.Ed.2d 306 (1979) (Puerto Rico is not a territory for purposes of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901–950).[6]

From the authorities cited, it is clear that the term territory is susceptible of interpretation because it does not have a "fixed and technical meaning that must be accorded to it in all circumstances." *Americana of Puerto Rico,* 368 F.2d at 436. Therefore,

we must determine whether the Navajo Nation may properly be considered a territory within the meaning of Arizona's Uniform Act.

### b. Legislative Intent

Tracy cites *Kriz v. Buckeye Petroleum Co.* for the proposition that the intent of the legislature at the time of the enactment governs the interpretation of the act. 145 Ariz. 374, 701 P.2d 1182 (1985). Accordingly, Tracy argues that because the 1937 Arizona legislature that adopted the Uniform Act could not have contemplated tribes as territories for purposes of the Act, we cannot now interpret the Uniform Act to include the Navajo Nation. We do not find this argument persuasive. In *Kriz,* we also stated that where the statutory language does not indicate the legislature's intent as to a particular application of the statute, we must "read the Act as a whole, looking to its subject matter, effects and consequences, reason, and spirit." *Id.* at 377, 701 P.2d at 1185; *see also Calvert v. Farmers Ins. Co.,* 144 Ariz. 291, 294, 697 P.2d 684, 687 (1985) (in interpreting statute and determining legislature's intent, supreme court will look to policy behind statute and the evil it was designed to remedy, as well as to the words, context, subject matter, and consequences of the statute).

Arizona's Uniform Act was adopted by the 1937 legislature without indication as to its prospective scope. H.B. 78, 13th Leg., 1st Reg.Sess., 1937 Ariz.Laws, ch. 74 § 2. However, given the status of tribal self-government on Arizona Indian reservations at that time,[7] we can safely conclude that

---

**5.** The Sherman Anti–Trust Act (15 U.S.C. §§ 1 through 7) proscribes certain acts in restraint of trade or commerce among the states, or "in *any Territory* of the United States or of the District of Columbia." 15 U.S.C. § 3 (emphasis added).

**6.** That the term territory must be interpreted in accordance with the purposes of the act in question is also apparent from Supreme Court opinions dealing with the District of Columbia. *Compare District of Columbia v. Carter,* 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973) *with Embry v. Palmer,* 107 U.S. 3, 2 S.Ct. 25, 27 L.Ed. 346 (1883).

**7.** In 1883, the Commissioner of Indian Affairs authorized creation of Courts of Indian Offenses to handle basic reservation law and order problems. These courts operated under Bureau of Indian Affairs regulations and were very much connected to the federal agency system on the newly created reservations. The Courts of Indian Offenses were generally not courts of record, nor were they initially an aspect of "inherent Indian sovereignty." These latter developments took place as the political systems of the tribes evolved, particularly after the Indian Reorganization Act (IRA) was passed in 1934 to allow tribes to assert their sovereign governing powers. Tribes that incorporated under the IRA

the 1937 legislature could not have contemplated whether the Act could or should be applied to Indian tribes.

### c. Methodology of Application

Essentially, Tracy and the dissent argue that because the legislature did not contemplate applying the Act to the Navajo Nation, we may not now make such an application. Under this view of statutory construction, Arizona would also be unable to recognize the Virgin Islands and Puerto Rico as territories for purposes of the Uniform Act. We believe that sound principles of statutory construction preclude such a narrow reading of the Uniform Act. Circumstances constantly arise presenting factual situations that were unforeseen at the time a statute was adopted. Consequently, the interpretation of general remedial statutes cannot fairly be limited to only those specific applications clearly contemplated by the legislature at the time of enactment. Such a limitation would impose an impossible burden on legislatures.

We note that the framers gave Congress power only to raise and maintain an army and navy. U.S. Const. art. I, § 8. Unless they were as prescient as Tennyson,[8] neither those who framed nor those who ratified the Constitution could have contemplated that this language would include an air force. Yet it surely must. *See* E. CORWIN, THE CONSTITUTION AND WHAT IT MEANS TODAY 70 and n. 172 (1954). Of course, if a particular application does violence to the text of a statute, our duty is clear: the application cannot be made. But the Uniform Act is not limited to "organized territories." Instead, the text of this statute extends to "any territory" and is broad enough, therefore, to include anything within the commonly understood meaning of the term. *See, e.g., State v. Korzep*, 165 Ariz. 490, 493, 799 P.2d 831, 834 (1990) ("We give words their usual and commonly understood meaning unless the legislature clearly intended a different meaning."). The Navajo Nation passes that test; it clearly fits the dictionary definition of a "geographical area" of the United States "under the jurisdiction of a political authority." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2361 (1965).

We also acknowledge that where a factual application of a statute was considered and rejected by the legislature, the courts are powerless. Again, such is not the case with this statute. The application of this statute to organized tribal governments and their court systems could not have been foreseen in 1937 and was not considered.

We deal, then, with a text broad enough to include the application advanced by the Navajo Nation. We deal also with an application not rejected but simply not foreseen by the legislature. We believe, with Mr. Justice Holmes, that in such cases it is a "wholesome truth that the final rendering of the meaning of a statute is an act of

---

drafted their own constitutions and laws, and set up independent court systems. *See generally* D. GETCHES & C. WILKINSON, FEDERAL INDIAN LAW 384–87 (2d ed. 1986) (quoting NATIONAL AMERICAN INDIAN COURT JUDGES ASS'N, INDIAN COURTS AND THE FUTURE 7–13, 88–102 (D. Getches, ed. 1978)); V. DELORIA, JR. & C. LYTLE, AMERICAN INDIANS, AMERICAN JUSTICE 113–116 (1983). Other tribes, such as the Navajo, chose not to incorporate under the IRA but, rather, to strengthen their sovereign status and develop their own political system. The Courts of Indian Offenses are now generally recognized as courts that operate under the residual sovereignty of the tribes rather than as agencies of the federal government. F. COHEN, HANDBOOK OF FEDERAL INDIAN LAW 251 (1982) (citing *Iron Crow v. Oglala Sioux Tribe*, 231 F.2d 89 (8th Cir.1956)). The Navajo Nation's Court of Indian Offenses evolved into a separate branch of government in 1958. The courts of the Navajo judicial branch are courts of record with rights of appeal to the Navajo Supreme Court, which hears issues of law raised in the lower court record. The Navajo Nation has developed an extensive tribal code that is bound and supplemented. Procedural rules of court are patterned after the federal rules. Decisions of the Navajo Supreme Court are published in the Navajo Reporter, and the Navajo courts use these as precedent. Federal and state opinions serve as persuasive authority. *See* Tso, *The Process of Decision–Making in Tribal Courts*, 31 ARIZ.L. REV. 225, 227–28 (1989); Tso, *The Tribal Court Survives in America*, 25 JUDGES' J. 22 (vol. 2, Spring 1986).

**8.** *See* "Locksley Hall" (1842).

judgment." Frankfurter, *Some Reflections on the Reading of Statutes,* 47 CO-LUM.L.REV. 527, 531 (1947). Nor do venerable "canons of [statutory] construction save us from the anguish of judgment. Such canons give an air of abstract intellectual compulsion to what is in fact a delicate judgment, concluding a complicated process of balancing subtle and elusive elements." Frankfurter, *supra,* 47 COLUM. L.REV. at 544. We agree with Mr. Justice Frankfurter that "laws are not abstract propositions. They are expressions of policy arising out of specific situations and addressed to the attainment of particular ends." *Id.* at 533. It is in part because legislatures cannot foresee every application that judges are required to interpret and apply statutes. *Id.*

Thus, in construing a general statute enacted to further a remedial purpose, we do not believe a specific application is outside the statute simply because it was not foreseen. *United States v. Jones,* 607 F.2d 269, 273 (9th Cir.1979), *cert. denied,* 444 U.S. 1085, 100 S.Ct. 1043, 62 L.Ed.2d 771 (1980); *Eastern Air Lines, Inc. v. Civil Aeronautics Bd.,* 354 F.2d 507, 510–11 (D.C.Cir.1965); *see Shell Co.,* 302 U.S. at 257, 58 S.Ct. at 169 (that Congress did not have Puerto Rico in mind when the Sherman Act was enacted is not enough to exclude Puerto Rico from the Act's operation; the proper inquiry is whether, had acquisition of Puerto Rico been foreseen, Congress would have intended to *exclude* Puerto Rico from the Act's operation).

■ Thus, where there is no contrary textual or legislative expression of intent on a particular application, we must apply the statute in such a manner as will best serve the legislature's purposes, policies, and goals. *See State v. Sweet,* 143 Ariz. 266, 270, 693 P.2d 921, 925 (1985); *Cohen v. State,* 121 Ariz. 6, 588 P.2d 299 (1978); *State v. Berry,* 101 Ariz. 310, 312, 419 P.2d 337, 339 (1966) (statutes must be construed in view of the purpose they are intended to accomplish and the evils they are designed to remedy).

Therefore, we turn to examine the purpose and policy behind the Uniform Act to see whether inclusion of the Navajo Nation is consistent with the Act's general intent.

### 2. *May Tribes Be Considered Territories for Purposes of this Statute?*

#### a. Consideration of Statutes Comparable to the Uniform Act

We must first determine whether tribes are sufficiently analogous to territories to fall within the legislature's general intent to broaden the definition of state by including territories. Indian tribes are quasi-sovereign entities with *sui generis* status as "domestic, dependent nations" under federal law. *Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 16–17, 8 L.Ed. 25 (1831). Indian tribes are not "foreign nations," as Tracy would have us believe, and thus do not come within the prohibition against foreign countries being deemed territories. *Id.; see Eidman v. Martinez,* 184 U.S. 578, 591, 22 S.Ct. 515, 520, 46 L.Ed. 697 (1902) (term territory in ordinary acts of Congress does not include foreign states).

Similarly, Indian tribes are not organized territories whose powers are delegated by Congress and therefore exist as "agencies" of the federal government. Rather, Indian tribes exercise powers of self-government as an aspect of their inherent sovereignty. *United States v. Wheeler,* 435 U.S. 313, 319–23, 98 S.Ct. 1079, 1084–86, 55 L.Ed.2d 303 (1978). In this respect, the Navajo Nation exercises its judicial power as would a state. *Id.* at 321–22, 98 S.Ct. at 1085 (tribe is separate sovereign from federal government for purposes of double jeopardy; in prosecuting tribal member for crime, tribe was not exercising federally delegated power, like territory, but sovereign power, like state).

■ Clearly, then, Indian tribes do not fit within the narrow definition of an organized territory. Instead, they occupy a unique status within our federal system. The tribes are similar to states in terms of their judicial jurisdiction and power of self-government over matters occurring within their territorial boundaries. *See Raymond v. Raymond,* 83 F. 721, 724 (8th Cir.1897). However, in exercising their powers of self-

government, Indian tribes are still subject to the overriding plenary authority of Congress. *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 56, 98 S.Ct. 1670, 1676, 56 L.Ed.2d 106 (1978). In this latter respect, Indian tribes are analogous to the territories of the United States, which are also subject to Congress's plenary power. *See Inter–Island Steam Nav. Co. v. Hawaii,* 305 U.S. 306, 314, 59 S.Ct. 202, 206, 83 L.Ed. 189 (1938) (Congress has full and complete legislative authority over territories).

The political status of Indian tribes has been analogized to that of other quasi-sovereign entities under the protection of the United States, such as Puerto Rico and the Virgin Islands. *See generally* Comment, *Conflicts Between State and Tribal Law: The Application of Full Faith and Credit Legislation to Indian Tribes,* 1981 ARIZ. ST.L.J. 801, 808; Clinton, *Tribal Courts and the Federal Union,* 26 WILLAMETTE L.REV. 841, 858 (1990).

In any case, Indian tribes, like Puerto Rico and the Virgin Islands, have often been regarded as territories for purposes of various statutory enactments. In *United States ex rel. Mackey v. Coxe,* for example, the United States Supreme Court held that the Cherokee Nation is a territory for purposes of a federal statute requiring recognition of administrators appointed from the territories. 59 U.S. (18 How.) 100, 15 L.Ed. 299 (1855). In holding that letters of administration issued by the Cherokee Nation should be given full faith and credit in a District of Columbia court, the Court stated:

> In some respects [the Cherokee people] bear the same relation to the federal government as a territory did in its second grade of government, under the ordinance of 1787. Such a territory passed its own laws, subject to the approval of congress, and its inhabitants were subject to the constitution and acts of congress. The principal difference consists in the fact that the Cherokees enact their own laws [subject to some federal restriction], appoint their own officers and pay their own expenses. This, however, is no reason why the laws and proceedings of the Cherokee territory, so far as relates to rights claimed under them, should not be placed upon the same footing as other territories in the Union. *It is not a foreign, but a domestic territory,—a territory which originated under our constitution and laws.... In no respect can it be considered a foreign State or territory, as it is within our jurisdiction and subject to our laws.*

*Id.* at 103–04 (emphasis added).[9]

Similarly, various lower federal courts and state courts have deemed Indian tribes to be states or territories within the meaning of the statutes under consideration. *See, e.g., In re Larch,* 872 F.2d 66 (4th Cir.1989) (Cherokee tribe is a state for purposes of the Parental Kidnapping Prevention Act, 28 U.S.C. § 1738); *Martinez v. Superior Court,* 152 Ariz. 300, 731 P.2d 1244 (Ct.App.1987) (Indian reservations are territories or possessions of the United States within the meaning of Arizona's Uniform Child Custody Jurisdiction Act, A.R.S. §§ 8–401 through 8–424); *Red Lake Band of Chippewa Indians v. State,* 311 Minn. 241, 248 N.W.2d 722 (1976) (Red Lake tribe was a state or territory for

---

**9.** Tracy asserts that *Mackey's* definition of territory was rejected by the Court's later decision in *In re Lane.* We disagree. In *Lane,* the Court was faced with the issue of whether the Oklahoma Indian territory, a *geographical area* set aside for *several* tribes, should be considered a territory for purposes of a federal criminal statute. In concluding that it should not be considered a territory, the Court focused on the fact that the Oklahoma Indian territory "had no legislative body ... no government ... no established or organized system of government for the control of the people within its limits, as the territories of the United States have ... always had." 135 U.S. at 448, 10 S.Ct. at 761. In contrast, the Court in *Mackey* considered the effect to be given to letters of administration issued pursuant to tribal law by the Cherokee *Nation,* a *tribal body* whose laws were "enacted [by a national council], approved by their executive, and carried into effect through an organized judiciary." 59 U.S. at 102. The situation in the case before us is analogous to *Mackey* rather than *Lane* because we consider the effect to be given to a tribal law enacted by the Navajo Nation, which possesses legislative, executive, and judicial branches of government.

purposes of a Minnesota motor vehicle statute that was premised on policy to recognize the validity of automobile registration licenses issued by other jurisdictions); *Whitsett v. Forehand,* 79 N.C. 230, 232 (1878) (Cherokee Nation is a territory for purposes of state statute governing admission of deed to probate and registration).

A majority of courts has deemed Indian tribes to be territories for purposes of the federal statute extending the application of the full faith and credit clause to the territories and possessions of the United States, 28 U.S.C. § 1738. *See, e.g., Sheppard v. Sheppard,* 104 Idaho 1, 655 P.2d 895 (1982); *Jim v. CIT Fin. Servs. Corp.,* 87 N.M. 362, 533 P.2d 751 (1975); *In re Buehl,* 87 Wash.2d 649, 555 P.2d 1334 (1976); *see also Cornells v. Shannon,* 63 F. 305, 306 (8th Cir.1894); *Standley v. Roberts,* 59 F. 836, 845 (8th Cir.1894); *Mehlin v. Ice,* 56 F. 12, 19 (8th Cir.1893) (recognizing Indian tribes as territories under an earlier version of the full faith and credit statute); *Santa Clara Pueblo,* 436 U.S. at 65 n. 21, 98 S.Ct. at 1681 n. 21 ("Judgments of tribal courts, as to matters properly within their jurisdiction, have been regarded in some circumstances as entitled to full faith and credit in other courts.") (citing *Mackey,* 59 U.S. (18 How.) 100; and *Standley,* 59 F. at 845).

In *Brown v. Babbitt Ford, Inc.,* our court of appeals took the opposite approach, declining to accord full faith and credit to a Navajo tribal statute governing automobile repossessions on the reservation. 117 Ariz. 192, 571 P.2d 689 (Ct.App. 1977). The court rejected the analysis of *Americana of Puerto Rico* that the term territory in 28 U.S.C. § 1738 may be construed to encompass entities other than organized territories. *Id.* at 196, 571 P.2d at 693. The court distinguished *Mackey,* pointing out that it dealt with the definition of territory in a different statute. *Id.* Instead, the court based its opinion on an

1883 district court case, *Ex Parte Morgan,* 20 F. 298 (D.C.Ark.1883), which held that territory refers only to organized territories that are destined for statehood, and that Indian tribes, as sovereigns predating the constitution, cannot be considered territories. *Brown,* 117 Ariz. at 196–97, 571 P.2d at 693–94.

We do not consider whether the court of appeals correctly decided that Indian tribes are not territories for purposes of the full faith and credit statute, as that issue is not now before us.[10] However, we disagree with the court's statement that "Indian reservations have never been considered as a 'territory' within the meaning of the laws of the United States, but simply they are the home of the Indians." *Id.* at 197, 571 P.2d at 694. This statement is contrary to the United States Supreme Court's decision in *Mackey,* as well as the many decisions of lower federal courts and state courts cited above holding that Indian tribes may be considered territories for purposes of certain statutes. In addition, the court seems to have overlooked the many federal cases holding that the term territory may be applied to quasi-sovereign entities that are not organized territories destined for statehood.

Indian tribes possess a unique political status; however, tribal governments are comparable to states and territories in many ways, and jurisdictionally, Indian reservations are a great deal more than "the home of the Indians." The case law demonstrates that Indian tribes may be considered territories within the meaning of certain statutes. The proper approach is to analyze each statute, in terms of its purpose and policy, to determine whether Indian tribes may be regarded as territories within the statute's intent, as another panel of our court of appeals did in *Martinez* with regard to Arizona's version of the Uniform Child Custody Jurisdiction Act.

---

10. We note that the United States Supreme Court has never decided this issue and that commentators disagree as to whether tribal laws and judgments should be entitled to full faith and credit under the statute. *See* Ragsdale, *Problems in the Application of Full Faith and Credit for Indian Tribes,* 7 N.M.L.REV. 133 (1977) (discussing problems in applying the full faith and credit statute to tribes and concluding that statute probably does not extend to the tribes); Comment, *supra,* 1981 ARIZ.ST.L.J. at 806–09, 820 (finding support for position that tribes qualify as territories, or at least as possessions, for purposes of full faith and credit statute).

152 Ariz. at 303, 305, 731 P.2d at 1247, 1249. Again we note that California, using this analysis, has recently held that the term "territory" in the Uniform Act we are considering includes the Navajo Nation. *Superior Court (Jans)*, 274 Cal.Rptr. 586.

### b. The Effect of the Principle of Comity

The controversy over the full faith and credit statute is most relevant to cases in which the issue is the effect to be given to tribal court judgments. In this case, we deal with a tribal law, rather than a judgment. As the court in *Brown* correctly noted, irrespective of the effect of the full faith and credit statute, tribal laws are entitled to recognition on the basis of comity if they are otherwise in accord with Arizona's public policy. 117 Ariz. at 198, 571 P.2d at 695; *see Fremont Indem. Co. v. Industrial Comm'n*, 144 Ariz. 339, 345, 697 P.2d 1089, 1095 (1985) (citing *Milwaukee County v. M.E. White Co.*, 296 U.S. 268, 272, 56 S.Ct. 229, 231, 80 L.Ed. 220 (1935)) (comity doctrine may apply even in situations in which the full faith and credit clause is inapplicable).

Arizona courts have consistently afforded full recognition to tribal court proceedings. For purposes of Arizona State Bar disciplinary proceedings, judgments of the Navajo Nation courts are given equivalent weight to judgments of other courts. *See In re MacDonald*, No. SB–91–0001–D (minute order, March 5, 1991) (granting State Bar's motion for interim suspension of Navajo attorney convicted of bribery, conspiracy, and other misdemeanors in Navajo District Court, pursuant to Rule 57(c), Rules of the Supreme Court, which provides for suspension if an attorney is convicted of a non-felony serious crime). Several other cases have given recognition to tribal court proceedings on the grounds of comity. *Leon v. Numkena*, 142 Ariz. 307, 311, 689 P.2d 566, 570 (Ct.App.1984) (divorce decree issued by Hopi tribal court was conclusive and binding against challenge in state superior court as a matter of comity and out of deference and mutual respect); *In re Lynch's Estate*, 92 Ariz. 354, 357, 377 P.2d 199, 201 (1962) (holding that proceedings in Navajo tribal court must be treated the same as proceedings in a court of another state, and therefore that a will admitted to probate in Navajo tribal court should have been given effect in ancillary proceedings in state superior court).

The principle of comity is that "the courts of one state or jurisdiction will give effect to the laws and judicial decisions of another state or jurisdiction, not as a matter of obligation, but out of deference and mutual respect." *Brown*, 117 Ariz. at 198, 571 P.2d at 695. The Uniform Act under consideration in the present case *is premised on the principle of comity*, not on full faith and credit. In *State v. Jordan*, this court held that:

> "The Uniform Act does not extend the jurisdiction of the courts of this state beyond its territorial limits, for this is not within the power of the legislature. The operation of the Uniform Act depends upon the principles of comity, and it has no efficacy except through the adoption of the same act by another state."

83 Ariz. 248, 251, 320 P.2d 446, 448 (1958) (quoting *State v. Blount*, 200 Or. 35, 264 P.2d 419, 426 (1953), *cert. denied*, 347 U.S. 962, 74 S.Ct. 711, 98 L.Ed. 1105 (1954)), *cert. denied*, 357 U.S. 922, 78 S.Ct. 1364 (1958); *accord State v. Lesco*, 194 Kan. 555, 400 P.2d 695, 699 (1965), *cert. denied*, 382 U.S. 1015, 86 S.Ct. 628, 15 L.Ed.2d 529 (1966); *In re Saperstein*, 30 N.J.Super. 373, 104 A.2d 842 (App.), *cert. denied*, 348 U.S. 874, 75 S.Ct. 110, 99 L.Ed. 688 (1954). Therefore, we believe the principles of comity militate in favor of interpreting the word territory to include the Navajo Nation.

### c. The Purpose and Policy Behind the Uniform Act

In considering whether to give the Uniform Act a broad or narrow construction, we note that the Act's definitional section provides that the term state *includes* any territory of the United States. A.R.S. § 13–4091(2). A term whose statutory definition declares what it "includes" is more susceptible to extension of meaning by construction than one whose definition de-

clares what the term "means." The word "includes" is most often a term of enlargement, rather than limitation, and a court may find that it encompasses items that were not specifically enumerated. 2A N. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 47.07, at 133 (4th ed. 1984 Rev.).

In addition, Arizona's Uniform Act is included within A.R.S. Title 13, the criminal code. The rules of construction for provisions within Title 13 are set forth at § 13–104, which provides:

The general rule that a penal statute is to be strictly construed does not apply to this title, but the provisions herein must be construed according to the fair meaning of their terms to promote justice and effect the objects of the law, including the purposes stated in § 13–101.

See State v. Tramble, 144 Ariz. 48, 51, 695 P.2d 737, 740 (1985) (rule of strict construction followed by other state courts in interpreting penal statutes is not consistent with Arizona's legislative policy).

We note also the public policy set forth by our legislature at the beginning of the chapter containing the Uniform Act. A.R.S. § 13–101 reads in relevant part:

It is declared that the public policy of this state and the general purposes of the provisions of this title are:

1. To proscribe conduct that unjustifiably and inexcusably causes or threatens substantial harm to individual or public interests; ...

\* \* \* \* \* \*

6. To impose just and deserved punishment on those whose conduct threatens the public peace.

This language indicates that Arizona's public policy supports interpreting the statutes within Title 13 in a manner that will further effective criminal prosecution. This is also an underlying purpose of the Uniform Act, which requires reciprocal cooperation among jurisdictions for the enforcement of witness attendance orders. See Vannier v.

Superior Court, 32 Cal.3d 163, 172, 650 P.2d 302, 306, 185 Cal.Rptr. 427, 431 (1982); Ortez v. State, 165 Ind.App. 678, 333 N.E.2d 838, 846 (1975).

In New York v. O'Neill, the United States Supreme Court upheld the constitutionality of the Uniform Act, noting that it was designed to solve the practical problems created by the constitutional division of powers, and that the " 'policy and necessity ... to preserve harmony between States, and order and law within their respective borders' " motivated the states to adopt the Uniform Act. 359 U.S. 1, 5–6, 79 S.Ct. 564, 568, 3 L.Ed.2d 585 (1959) (citation omitted). The Court further stated:

The primary purpose of this Act is not eleemosynary. It serves a self-protective function for each of the enacting States.... Today forty-two States and Puerto Rico [11] may facilitate criminal proceedings, otherwise impeded by the unavailability of material witnesses, by utilizing the machinery of this reciprocal legislation to obtain such witnesses from without their boundaries. This is not a merely altruistic, disinterested enactment.

Id. at 9, 79 S.Ct. at 570; accord In re Saperstein, 104 A.2d at 846 (New Jersey's Uniform Act was enacted in aid of comity between states to assist the orderly and effectual administration of justice and prosecution of criminal conduct).

In light of the articulated purposes behind the Uniform Act, we must next examine the jurisdictional nature of Indian tribes to determine whether the Uniform Act's purposes will be served by interpreting territory to include the Navajo Nation.

#### d. The Jurisdiction of Indian Tribes

Indian tribes have historically been regarded as distinct, sovereign political entities, subject only to the plenary authority of Congress. See generally F. COHEN, HANDBOOK OF FEDERAL INDIAN LAW 232–33 (1982). In Worcester v. Georgia, Chief Justice John Marshall articulated

---

**11.** Again, the Uniform Act applies to states, which includes "any territory." Puerto Rico is a commonwealth, not an organized territory; evidently, however, the Supreme Court assumes that the Uniform Act applies on a broader basis.

the foundation for the principle that tribal sovereignty over its territory and people, and federal protection of the tribes, combine to eliminate state jurisdiction:

> The Cherokee nation, then, is a distinct community, occupying its own territory, with boundaries accurately described, in which the laws of Georgia can have no force, and which the citizens of Georgia have no right to enter, but with the assent of the Cherokees themselves, or in conformity with treaties and with the acts of congress. The whole intercourse between the United States and this nation, is, by our constitution and laws, vested in the government of the United States.

31 U.S. (6 Pet.) 515, 561, 8 L.Ed. 483 (1832). Thus, although a tribe may be within the geographical boundaries of a state, the tribe is jurisdictionally distinct from the state, and the state has no authority to impose its laws on the reservation.[12]

In several more recent decisions, the United States Supreme Court has held that the 1868 Navajo Treaty precludes extension of state law to Indians residing on the Navajo reservation. *See McClanahan v. State Tax Comm'n of Arizona*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); *Warren Trading Post v. Arizona Tax Comm'n*, 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965); *Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959). In *McClanahan*, the Court acknowledged that the state has no civil or criminal jurisdiction on the reservation absent some affirmative delegation by Congress and pursuant to tribal consent. 411 U.S. at 177–80, 93 S.Ct. at 1265–67.

In accordance with the principles that limit state jurisdiction over Indian Country, various courts have invalidated states' attempts to reach Indians residing on the reservation. Thus, in the area of extradi-

tion it has been held that control of the extradition process is inherent in the tribal sovereignty of the Navajo Nation, and therefore a state may not arrest an Indian located on the Navajo reservation, but rather must seek extradition through the Navajo courts. *Arizona ex rel. Merrill v. Turtle*, 413 F.2d 683 (9th Cir.1969), *cert. denied*, 396 U.S. 1003, 90 S.Ct. 551, 24 L.Ed.2d 494 (1970); *see also Benally v. Marcum*, 89 N.M. 463, 553 P.2d 1270 (1976); A.R.S. § 13–3869 (allowing extradition of persons to and from an Indian reservation only if both the Indian tribal governing body and the state have mutually entered into an extradition compact, and providing that the state shall comply with tribal extradition law).

■ The jurisdiction of state courts has been similarly circumscribed in the area of civil process. State officials may not enforce valid state court judgments against Indians residing on the reservation. *See, e.g., Joe v. Marcum*, 621 F.2d 358 (10th Cir.1980); *Begay v. Roberts*, 167 Ariz. 375, 807 P.2d 1111 (1990), *rev. denied* April 22, 1991 (state court has no jurisdiction to garnish a tribal member's wages, earned on the reservation, where tribal law does not permit garnishment of wages); *Annis v. Dewey County Bank*, 335 F.Supp. 133 (D.S.D.1971) (state officials may not enforce state judgment by attaching property located on Cheyenne River Sioux reservation). This court has held that state officers lack authority to serve process on Indians residing on the reservation. *Francisco v. Arizona*, 113 Ariz. 427, 556 P.2d 1 (1976). Automobile dealers must comply with *tribal* law when repossessing automobiles on a reservation. *Babbitt Ford, Inc. v. Navajo Indian Tribe*, 710 F.2d 587 (9th Cir.1983), *cert. denied*, 466 U.S. 926, 104 S.Ct. 1707, 80 L.Ed.2d 180 (1984).

---

**12.** In Arizona, the considerable amount of Indian land often leads to jurisdictional conflicts. Within Arizona's geographical boundaries lies the greatest amount of Indian land of any state within the continental United States. There are approximately 19,623,000 acres of tribally owned and allotted individual land within Arizona; this is roughly 26.99% of the total acreage

within the state. D. GETCHES & C. WILKINSON, *supra*, at 13 (from T. TAYLOR, THE STATES AND THEIR INDIAN CITIZENS 176 (1972)). The State of Arizona has entered into several cooperative agreements with the tribes to alleviate jurisdictional problems. *See id.* at 547.

From the foregoing, it is obvious that Arizona courts lack jurisdiction to compel a Navajo witness located on the Navajo reservation to testify in a state court criminal proceeding without resort to the provisions of the Uniform Act. The Uniform Act is only operative where the other jurisdiction has enacted reciprocal legislation, as the Navajo Nation has done here. Therefore, if we decline to recognize the Navajo Nation for purposes of our Uniform Act, we would undercut the process of efficient law enforcement in our own state proceedings by rendering a significant number of people potentially unavailable as witnesses.

The Navajo Nation has nearly 200,000 members on a reservation that consists of more than fifteen million acres, about two-thirds of which is within the geographical boundaries of Arizona. We would do violence to the legislative purpose that prompted the adoption of the Uniform Act were we to exclude the Navajo Nation from recognition, thereby allowing material witnesses to evade testifying in our courts, or those of the Navajo Nation. The close proximity of our respective jurisdictions favors recognizing valid enactments of the Navajo Nation that do not conflict with our own public policy.

e. Other Policy Considerations

Recognizing the Navajo Nation as a territory for purposes of the Uniform Act would support Arizona's policy of facilitating effective criminal prosecution. However, Tracy argues that if we allow an Arizona court to summon an "Arizona citizen" to appear as a witness in a "foreign sovereign's political courts," we will be, in effect, supporting civil rights violations against our citizens. Tracy Memorandum on Special Action at 2. As we have already discussed, the Navajo Nation is clearly a separate jurisdiction within our federal system and not a foreign sovereign. Regarding the civil rights violations, Tracy claims

that the Navajo court's use of the Uniform Act is an exercise of criminal jurisdiction, which is prohibited under the opinions of the Supreme Court in *Oliphant* and *Duro*, and that *Duro* casts doubt on the legitimacy of tribal courts in general.

The Uniform Act is a provision to assist jurisdictions in conducting criminal prosecutions. In any prosecution there may be a need for the testimony of a material witness who resides beyond the subpoena power of the prosecuting state. Either the prosecutor or the defendant may utilize the Uniform Act to procure the attendance of such a witness. *State v. Smith*, 87 N.J.Super. 98, 208 A.2d 171, 174 (App.1965). In fact, where the testimony is critical to the defense, it may violate the defendant's due process rights to deny his request to summon an out-of-state witness to testify in his behalf under the Uniform Act. *State v. Brady*, 122 Ariz. 228, 594 P.2d 94 (1979).[13] The Uniform Act, then, serves a truth-seeking function and is consistent with other mechanisms that are intended to assist in the pursuit of a fair trial.

Thus, though the *purpose* of the Uniform Act is to assist in criminal prosecutions, the *proceedings* to compel attendance of a witness under the Uniform Act are *not* criminal in nature. *Epstein v. New York*, 157 So.2d 705, 707 (Fla.App.1963). In addition, the Uniform Act does not extend the criminal jurisdiction of the requesting jurisdiction beyond its boundaries; rather, the Act's effectiveness depends on principles of comity and reciprocity in the courts of the jurisdiction where the witness resides. *See Jordan*, 83 Ariz. at 251, 320 P.2d at 448. Once an Arizona court has issued the summons and Tracy appears in the tribal court, he will be subject to the Navajo court's authority to compel his testimony. If Tracy refuses to testify despite a grant of constitutionally adequate immunity, the Navajo court will have the inherent power of any court to cite him for

**13.** In *Brady*, we held that the trial court's denial of defendant's request to summon a material out-of-state witness constituted a denial of due process because it interfered with defendant's constitutional right to have compulsory process for obtaining witnesses in her favor. 122 Ariz. at 229–30, 594 P.2d at 95–96. The constitutional right to secure compulsory process is guaranteed by the sixth amendment to the United States Constitution, article 2, § 24 of the Arizona Constitution, and Title 1, § 6 of the Navajo Tribal Code.

contempt. *See Willie v. Herrick,* 5 Nav. Rptr. 129, 130 (Nav.Sup.Ct.1987) (Navajo Nation courts have inherent power to punish for contempt). We assume that the Navajo court would be limited to civil contempt sanctions, due to its lack of criminal jurisdiction over non-Indians. *See Oliphant,* 435 U.S. 191, 98 S.Ct. 1011.

Thus, to the extent that Tracy will be subject to the authority of the Navajo court, this will be an exercise of the court's *civil* jurisdiction. *Oliphant*'s discussion regarding the inability of a tribal court to criminally prosecute a non-Indian is therefore irrelevant to Tracy's situation. Instead we must focus on the statements of the United States Supreme Court regarding the civil jurisdiction of tribal courts. The Supreme Court has consistently upheld tribal courts' jurisdiction over civil cases involving personal and property rights of both Indians and non-Indians. *Santa Clara Pueblo,* 436 U.S. at 65, 98 S.Ct. at 1680–81. In recognition that the tribes' exercise of civil jurisdiction has not been constrained by federal action, the Court has declined to extend the *Oliphant* limitations to the realm of tribal civil jurisdiction. *National Farmers Union Ins. Co. v. Crow Tribe of Indians,* 471 U.S. 845, 854–55, 105 S.Ct. 2447, 2452–53, 85 L.Ed.2d 818 (1985). In *Iowa Mut. Ins. Co. v. LaPlante,* the Supreme Court stated:

> Tribal courts play a vital role in tribal self-government, and the Federal government has consistently encouraged their development. Although the criminal jurisdiction of the tribal courts is subject to substantial federal limitation, their civil jurisdiction is not similarly restricted.

480 U.S. 9, 14–15, 107 S.Ct. 971, 975–76, 94 L.Ed.2d 10 (1987) (citations omitted).

We do not believe summoning Tracy to appear before the Navajo District Court to testify about his transactions with the Navajos poses any inherent violation of his civil rights as a citizen of Arizona. Tracy is not subject to tribal criminal prosecution and the Navajo courts have civil jurisdiction over non-Indians. *Williams,* 358 U.S. at 222, 79 S.Ct. at 272. Tracy apparently voluntarily entered into consensual dealings with Peter MacDonald, Sr. and/or the Navajo Nation, which renders his testimony material to a valid tribal prosecution of one of its members, and, in addition, indicates that he could have foreseen the possibility that he would become subject to the civil jurisdiction of the tribal court.[14]

Further, by declining to recognize the Navajo Nation for purposes of our Uniform Act, we would impinge on the Navajo Nation's powers of self-government by undercutting the tribe's ability to prosecute a tribal offender. *See Wheeler,* 435 U.S. at 322, 98 S.Ct. at 1085 (stating that the right of internal self-government possessed by Indian tribes "includes the right to prescribe laws applicable to tribe members and to enforce those laws by criminal sanctions"). The decisions of the United States Supreme Court have consistently supported the federal government's long-standing policy of encouraging tribal self-government. *Iowa Mut. Ins.,* 480 U.S. at 14, 107 S.Ct. at 975 (citing *Three Affiliated Tribes v. Wold Engineering,* 476 U.S. 877, 890, 106 S.Ct. 2305, 2313, 90 L.Ed.2d 881 (1986); *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 138 n. 5, 102 S.Ct. 894, 902 n. 5, 71 L.Ed.2d 21 (1982); *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 143–44 and n. 10, 100 S.Ct. 2578, 2583–84 and n. 10, 65 L.Ed.2d 665 (1980); *Williams,* 358 U.S. at 220–22, 79 S.Ct. at 270–71). As the California appeals court noted in *Superior Court (Jans):*

> "the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases or other arrangements"); *Babbitt Ford,* 710 F.2d at 593 (tribal court appropriately exercised civil jurisdiction over non-Indian automobile dealer who repossessed automobile on the reservation, in violation of tribal law, even where contract with Indian was entered into off the reservation).

**14.** The United States Supreme Court and lower federal courts have consistently held that voluntary, consensual dealings with a tribe or its members can render a non-Indian subject to the tribal court's civil jurisdiction. *See, e.g., Montana v. United States,* 450 U.S. 544, 565, 101 S.Ct. 1245, 1258, 67 L.Ed.2d 493 (1981) ("Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians"; in particular the tribes may regulate

[E]ach jurisdiction is encouraged to interpret matters which concern tribal governance in a manner which fosters self-determination. In recognizing the right of the tribal courts to request the attendance of witnesses, we recognize their right to conduct such criminal proceedings. To deny them the power to compel witnesses we risk reducing their criminal proceedings to a farce or sham. If they cannot force necessary and material witnesses to appear they must either proceed in the face of inadequate evidence or be deprived of the ability to prosecute certain criminals.... If we barred Native American nations from the community of jurisdictions which reciprocally recognize one another, we would undermine their self-determination.

274 Cal.Rptr. at 590 (citations omitted).[15]

We conclude that substantial case authority, a proper methodology of statutory construction, the policy goals articulated by the legislature, and principles of comity, together with the specific objectives underlying Arizona's Uniform Act, all require us to read the term "any territory," as used in A.R.S. §§ 13–4091 through 13–4096, to include the Navajo Nation. Such a construction belies neither the text of the statute nor the legislature's intent.

C. Undue Hardship and the Privilege Against Self–Incrimination

Having decided that the Navajo Nation is a territory for purposes of the Uniform Act, we must examine whether the petitioners would face undue hardship if summoned before the Navajo District Court. If so, under A.R.S. § 13–4092(B), the Act could not be invoked to compel the attendance of the petitioners.

Tracy claims he will suffer undue hardship in that he will be forced to testify, under threat of contempt, without a constitutionally adequate grant of immunity, and thus will be required to forfeit his fifth

amendment privilege against self-incrimination. Tracy alleges he is the "subject of a pending federal grand jury investigation in Phoenix" that is apparently related to the events leading to this case. Tracy Memorandum on Special Action at 16. Thus, Tracy argues, he faces a real threat of self-incrimination. Consequently, Tracy asserted his federal and state constitutional privileges against self-incrimination during depositions and other proceedings in connection with the Big Boquillas civil case filed by the Navajo Nation in Maricopa County Superior Court. Essentially, Tracy advances two arguments under his fifth amendment claim. First, irrespective of the fact that the Navajo Nation cannot criminally prosecute him, Tracy claims that his testimony as a witness will incriminate him for purposes of any prospective federal prosecution. And second, Tracy claims that the Navajo Nation is using the Uniform Act to obtain an improper advantage in the civil case.

1. *The Privilege Against Self–Incrimination as Applied to the Navajo Nation*

■ Tracy contends that the fifth amendment privilege against self-incrimination does not apply to Indian tribes and that the immunity provision in the Navajo Code, 17 Navajo Trib.Code § 208, does not provide constitutionally adequate immunity to a witness who is compelled to give incriminating testimony.

Historically, Indian tribes were not subject to the Bill of Rights and other constitutional guarantees limiting the federal and state governments. In *Talton v. Mayes,* the Supreme Court held that the fifth amendment right to a grand jury was not applicable to a tribal prosecution against one of its members because "the powers of local self-government enjoyed by the Cherokee nation existed prior to the Constitution" and therefore "[these powers] are not operated upon by the Fifth Amendment."

15. *See, e.g.,* discussion in note 12, *supra,* regarding a defendant's right to use compulsory process to obtain witnesses in his favor. This right is guaranteed by the Navajo Bill of Rights (1 Navajo Trib.Code § 6) and would be seriously undermined if the Navajo courts had no means to summon material witnesses outside their jurisdiction.

163 U.S. 376, 384, 16 S.Ct. 986, 989, 41 L.Ed. 196 (1896). *Talton*'s holding was subsequently extended to various other constitutional provisions, providing the basis for the Supreme Court's statement in *Santa Clara Pueblo* that "[a]s separate sovereigns pre-existing the Constitution, tribes have historically been regarded as unconstrained by those Constitutional provisions framed specifically as limitations on federal or state authority." 436 U.S. at 56, 98 S.Ct. at 1675–76.

The *Talton* Court recognized, however, that Congress has plenary authority to limit, modify, or eliminate the powers of local self-government that the tribes otherwise possess. 163 U.S. at 384, 16 S.Ct. at 989. In accordance with this power, Congress enacted the 1968 Indian Civil Rights Act (the ICRA), which imposes on the tribes restrictions similar to those contained in the Bill of Rights and the fourteenth amendment. *See* 25 U.S.C. §§ 1301 to 1303 (1983 & 1990 Supp.). The articulated purpose of the bill that eventually became the ICRA was:

> [t]o protect individual Indians from arbitrary and unjust actions of tribal governments. This is accomplished by placing certain limitations on an Indian tribe in the exercise of its powers of self-government. *These limitations are the same as those imposed on the Government of the United States by the United States Constitution and on the States by judicial interpretation.*

S.Rep. No. 841, 90th Cong. 1st Sess. (Dec. 1967) (emphasis added).

Although the primary purpose of the ICRA was to provide Indians with protection from arbitrary action by their tribal governments, the protections of the act extend to "any person" subject to tribal jurisdiction, which the courts have read to include non-Indians. *See, e.g., Dry Creek Lodge, Inc. v. United States,* 515 F.2d 926, 934 (10th Cir.1975); *Dodge v. Nakai,* 298 F.Supp. 17, 24 (D.C.Ariz.1968) (noting that legislative history indicates that "any Indian" language was changed to "any person" so that provision would cover all persons subject to tribal jurisdiction).

The ICRA specifically imposes on the tribes the fifth amendment privilege against self-incrimination, stating in relevant part that "no Indian tribe in exercising powers of self-government shall ... compel any person in any criminal case to be a witness against himself." 25 U.S.C. § 1302(4). The language in section 1302(4) is virtually identical to that of the fifth amendment.

Tracy argues, however, that the privilege against self-incrimination offered by the ICRA provides protection inferior to that of the United States and Arizona Constitutions. We disagree. It is true that certain provisions of the ICRA do not mirror those of the federal constitution and have been interpreted somewhat differently from their federal counterparts.[16] On the other hand, provisions of the ICRA that clearly mirror the federal provisions in language and intent, such as the prohibition against unreasonable search and seizure, have been interpreted under the federal standard and are generally held to be identical to their

---

**16.** For example, the equal protection provision guarantees "the equal protection of *its* [the tribe's] laws," rather than of "*the* laws." *Santa Clara Pueblo,* 436 U.S. at 63 n. 14, 98 S.Ct. at 1679 n. 14 (quoting 25 U.S.C. § 1302(8) (emphasis in *Santa Clara Pueblo* )). In recognition that a strict construction of the equal protection clause could work a significant interference with tribal custom and tradition, the federal courts have declined to construe the provision under the federal standard. *See, e.g., Wounded Head v. Tribal Council of Oglala Sioux Tribe,* 507 F.2d 1079, 1082–83 (8th Cir.1975) (equal protection clause of the ICRA is not in all respects coextensive with the fourteenth amendment); *Tom v. Sutton,* 533 F.2d 1101, 1104–05 n.

5 (9th Cir.1976) (terms "due process" and "equal protection" as used in the ICRA are construed "with due regard for historical, governmental and cultural values of an Indian tribe," and such "terms are not always given same meaning as they have come to represent under the United States Constitution"); *Howlett v. Salish and Kootenai Tribes,* 529 F.2d 233, 238 (9th Cir.1976) (when application of federal equal protection standard would significantly impair tribal custom or practice and individual injury is not grievous, equal protection clause of ICRA may be implemented differently; however, same interpretation governs where tribal procedure parallels that of the larger American society).

federal counterparts. *See, e.g., United States v. Clifford,* 664 F.2d 1090, 1091–92 n. 3 (8th Cir.1981) (fourth amendment standard is used for analyzing search and seizure conduct of tribal officers under ICRA) (citing *United States v. Lester,* 647 F.2d 869, 872 (8th Cir.1981)); *see also United States v. Strong,* 778 F.2d 1393, 1397 (9th Cir.1985); *Ortiz–Barraza v. United States,* 512 F.2d 1176 (9th Cir.1975). The privilege against self-incrimination appears to fall within this latter category. *Strong,* 778 F.2d at 1397. The language duplicates that of the federal constitution and clearly could not be interpreted to provide any lesser protection.

We believe, therefore, that when testifying in tribal court, Tracy will enjoy a federally imposed privilege against self-incrimination that is substantially coextensive with the fifth amendment privilege. Presumably, then, the Navajo Nation could not compel Tracy's testimony without a grant of use and derivative use immunity sufficient to meet the dictates of the fifth amendment. *See Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

Tracy argues, however, that a provision of the Navajo Tribal Code, 17 Navajo Trib. Code § 208(A) and (B), purports to override the federal privilege.[17] We are unable to conclude from the statute's language and structure that it authorizes a court to order a material witness to testify without any grant of immunity, where that witness faces a threat of incrimination.[18] Even if the statute purports to do this, we believe it would be held invalid by the Navajo Nation's judicial branch as a violation of the privilege against self-incrimination set forth in the ICRA and the privilege against self-incrimination set forth in the Navajo Bill of Rights, 1 Navajo Trib.Code § 5. A tribal code provision cannot operate in violation of the ICRA, and the Navajo courts are the proper forums to adjudicate this issue. As the Supreme Court noted in *Santa Clara Pueblo,* "[t]ribal forums are available to vindicate rights created by the ICRA, and § 1302 has the substantial and intended effect of changing the law which these forums are obliged to apply." 436 U.S. at 65, 98 S.Ct. at 1680.[19]

■ Finally, even in the unlikely event that the Navajo courts force Tracy to testify without a constitutionally adequate grant of immunity, he has an adequate remedy in federal court through the habeas corpus provision of the ICRA, 25 U.S.C. § 1303. Section 1303 provides that "[t]he privilege of the writ of habeas corpus shall be available to any person, in a court of the United States, to test the legality of his detention by order of an Indian tribe." A writ of habeas corpus is available whether the petitioner is held under civil or criminal process. *Wales v. Whitney,* 114 U.S. 564, 571, 5 S.Ct. 1050, 1053, 29 L.Ed. 277 (1885).

---

17. Section 208(A) applies to investigation proceedings and provides that a witness in possession of material information regarding an offense may be required to testify upon issuance of a court order granting use immunity. Section 208(B) covers the same issue in the context of court proceedings. Section 208(B) provides that the court may issue an order compelling testimony, notwithstanding the witness's privilege against self-incrimination, "if it finds: (1) the testimony ... may be necessary to the public interest; and (2) the person has refused, or is likely to refuse, to testify ... on the basis of his privilege against self-incrimination." Section 208(B) does not explicitly provide for a grant of immunity, and it is unclear whether the provision of § 208(A) regarding use immunity is to be read into § 208(B) as well.

18. In addition, we note that the Navajo courts apparently interpret 17 Navajo Trib.Code § 208 to afford full use and derivative use immunity.

The witnesses who testified at the MacDonalds' first trial under a different complaint were granted full use and derivative use immunity under 17 Navajo Trib.Code 208 by the Navajo District Court. Response to Petition (Exhibit B, Hughes Affidavit at para. 6; Exhibit C, Order Granting Use and Derivative Use Immunity).

19. Further, the Navajo Supreme Court has held that where questions under the ICRA arise, the court will look to precedents of the United States Supreme Court and the ninth circuit for guidance. *Navajo Nation v. Peter MacDonald, Sr.* No. A–CV–36–90, slip op. at 31 (Nav.Sup.Ct. Sept. 26, 1990); *see, e.g., Navajo Nation v. Browneyes,* 1 Nav.Rptr. 300 (Nav.Ct.App.1978) (interpreting equal protection clause in accordance with fourteenth amendment guarantee) (the Navajo Court of Appeals became the Navajo Supreme Court in 1985; *see* Tso, *supra,* 25 JUDGES' J. at 53).

A habeas action may be used to discharge a witness who is restrained under a contempt order made by a court in excess of its jurisdiction. *See Ex Parte Hudgings,* 249 U.S. 378, 384–85, 39 S.Ct. 337, 340, 63 L.Ed. 656 (1919). When a witness asserts his privilege against self-incrimination and the court improperly denies the privilege, any commitment of the witness in contempt is in excess of the jurisdiction of the court and is therefore void. *See Counselman v. Hitchcock,* 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892).

Moreover, the habeas corpus provision of the ICRA is quite expansive. The petitioner need only be detained by the tribal court order, and need not be in custody. 25 U.S.C. § 1303. Even prior to the effective date of the ICRA, at least one court held that federal habeas review lies where the petitioner has merely been fined by the tribal court, rather than imprisoned. *See, e.g., Settler v. Yakima Tribal Court,* 419 F.2d 486, 490 (9th Cir.1969), *cert. denied,* 398 U.S. 903, 90 S.Ct. 1690, 26 L.Ed.2d 61 (1970). Apparently, then, Tracy may use the habeas corpus remedy whether he is fined or imprisoned in a civil contempt action.

We hold that issuance of a subpoena by an Arizona court, compelling Tracy's attendance in Navajo court, creates no undue hardship to Tracy with regard to his constitutional privilege against self-incrimination.

2. *The Use of Compelled Testimony in a Subsequent Federal Prosecution*

Tracy raises the further issue that immunized testimony given before a tribal court may not be similarly recognized in a federal court proceeding. Obviously, one jurisdiction may not grant immunity to a witness for purposes of a related proceeding in another jurisdiction. However, in *Murphy v. Waterfront Commission,* the Supreme Court held that "a state witness may not be compelled to give testimony which may be incriminating under federal law unless the compelled testimony and its fruits cannot be used in any manner by federal officials in connection with a criminal prosecution against him." 378 U.S. 52, 79, 84 S.Ct. 1594, 1609, 12 L.Ed.2d 678 (1964). The Court made it clear that the reciprocal rule would apply where a federal witness faces danger of incrimination under state law. *Id.* at 77–78, 84 S.Ct. at 1608.

While there is no case directly on point to determine whether the *Murphy* doctrine applies in a related federal court proceeding to bar the use of immunized testimony given in tribal court, we believe it does. First, although the facts in *Murphy* involved only the state/federal relationship, the Court phrased the issue under consideration more broadly, as the question of whether:

> [O]ne *jurisdiction within our federal structure* may compel a witness, whom it has immunized from prosecution under its laws, to give testimony which might then be used to convict him of a crime against *another such jurisdiction.*

*Id.* at 53, 84 S.Ct. at 1596 (emphasis added). As we have already discussed, Indian tribes are separate jurisdictions within our federal system. Further, the federal trust relationship of the United States government with the tribes creates a distinct likelihood of dual prosecution by tribal and federal courts of crimes arising from the same events. For example, federal courts have jurisdiction over enumerated "major crimes" that occur on the reservation under 18 U.S.C. § 1153; however, tribal courts may prosecute lesser included offenses arising out of the same event. *See Wheeler,* 435 U.S. at 330, 98 S.Ct. at 1090. In view of the strong likelihood that testimony given in a tribal prosecution could later be used in a federal prosecution, it seems unthinkable that a federal court would find the *Murphy* doctrine inapplicable after Congress expressly imposed the privilege against self-incrimination on the tribes through the ICRA.

The eighth circuit has held that Indian witnesses may be compelled to testify under a grant of immunity in a federal grand jury proceeding even though they might later face prosecution in their tribal court. *In re Long Visitor,* 523 F.2d 443 (8th Cir. 1975). The court believed the *Murphy* doctrine would apply because the ICRA ex-

pressly protects Indians from self-incrimination. *Id.* at 447.

We therefore reject Tracy's arguments that he should not be compelled to testify because the testimony might later be used against him in federal court.

### 3. *The Use of Testimony in Civil Proceedings*

█ Tracy argues that the Navajo Nation's use of the Uniform Act is an improper attempt to gain his testimony for use in the Big Boquillas civil case. We do not agree. The privilege against self-incrimination applies only where the witness is in danger of facing *criminal* liability. There is no equivalent privilege to refuse to testify to avoid *civil* liability. 8 WIGMORE, EVIDENCE § 2254, at 331 (McNaughten rev.1961); *United States v. Kates,* 419 F.Supp. 846 (E.D.Pa.1976); *see, e.g., Ex Parte Butler,* 522 S.W.2d 196, 198 (Tex. 1975) (the fact that answer might subject witness to civil liability did not constitute ground for asserting privilege against self-incrimination).

Thus, there is no proscription against using compelled immunized testimony against a witness in a civil proceeding. *See United States v. Cappetto,* 502 F.2d 1351, 1359 (7th Cir.1974), *cert. denied,* 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975) (testimony given by a party in a civil case under a grant of immunity may be used against him in that case, although it may not be used in any criminal proceeding). We find no impropriety in the Navajo Nation's adoption of the Uniform Act in connection with the multicount prosecutions of the MacDonalds.

### D. Undue Hardship and the Professional Privilege Claims

█ Finally, we address the issues relating to professional privilege raised by

the intervening petitioners.[20] Essentially, these petitioners argue that an Arizona court should decline to issue subpoenas based on the undue hardship exception in A.R.S. § 13–4092(B) because the Navajo District Court might not recognize the Arizona statutory privileges for attorney-client and accountant-client relationships.

Quite simply, the professional privileges are a matter for the requesting jurisdiction to rule on and are not appropriately addressed to the state court issuing the subpoena. *See In re California Grand Jury Investigation,* 471 A.2d 1141, 1145 (Md. App.1984), *cert. denied sub nom. Rees v. Los Angeles County,* 467 U.S. 1205, 104 S.Ct. 2388, 81 L.Ed.2d 346 (1984) (Maryland witness subpoenaed to testify in California under the Uniform Act could not claim he would suffer undue hardship based on being forced to testify in California regarding matters privileged under Maryland's Press Shield Law, as that law had no extraterritorial application).

Because the professional privileges are not based on any constitutional mandate, the laws of each jurisdiction may appropriately vary. In addition, the testimonial privileges have been held to contravene the fundamental principle that "the public has a right to every man's evidence," and they are therefore strictly construed and weighed against other policy considerations. *Trammel v. United States,* 445 U.S. 40, 50, 100 S.Ct. 906, 912, 63 L.Ed.2d 186 (1980).

Thus, we need not consider whether the courts of the Navajo Nation recognize the attorney-client or accountant-client privileges as those privileges exist in Arizona.[21] We do not believe that petitioners face any undue hardship by having the Navajo Dis-

**20.** It is asserted that these petitioners have material evidence to give due to their positions as lawyers and accountants to parties allegedly involved in the Big Boquillas transaction.

**21.** We observe, however, that the Navajo Nation requires attorneys to be members of the Navajo Nation Bar before they may appear before the courts of the Navajo Nation. The attorneys of

the Navajo Nation Bar are governed by the same code of professional ethics as that promulgated by the American Bar Association. *In re Deschinny,* 1 Navajo Rptr. 66 (Nav.Sup.Ct.1972). Thus, the Navajo Nation recognizes the ethical constraints governing the attorney-client relationship. The Navajo Nation appears also to recognize the attorney-client privilege in Rule 13 of the Navajo Nation Rules of Evidence.

trict Court rule on the merits of their privilege arguments at the time the testimony is sought.

## CONCLUSION

We conclude that the term "territory," as used in the Uniform Act, has no fixed, immutable meaning but is subject, instead, to interpretation. Although the legislature did not contemplate the specific application of the Uniform Act to the facts before us, the proper question is whether such an application is appropriate given the text of the statute, the policies articulated by the legislature in that and other statutes, and the public policy of the state. Review of these factors and the relevant body of law indicates that a tribe may be considered a territory for purposes of statutory enactments such as the one now before us. The principle of comity, which Arizona courts have applied to enactments and decisions of the Navajo Nation and its courts, also favors interpreting the Uniform Act in such a manner. Interpreting the Uniform Act to include the Navajo Nation also furthers the law enforcement interests of both Arizona and the Navajo Nation, thereby fulfilling the Act's objectives, and does not impair the constitutional rights of the petitioners or cause them any undue hardship.

We hold, therefore, that the term "territory," as used in the Uniform Act, A.R.S. §§ 13–4091 through 13–4096, encompasses the Navajo Nation. The petitioner and intervenors here were properly summoned as material witnesses in criminal proceedings before the Navajo District Court. The superior court judge did not exceed his jurisdiction or abuse his discretion in issuing the subpoenas under the Uniform Act. Having previously accepted jurisdiction, we now deny relief.

Respondents shall be entitled to claim their costs as provided by our rules. *See* Rule 21, Ariz.R.Civ.App.P., 17B A.R.S.

GORDON, C.J., and SARAH D. GRANT, Chief Judge, concur.

CORCORAN, J., did not participate in this decision; pursuant to Ariz. Const. art. 6, § 3, SARAH D. GRANT, Chief

Judge, of Division One, Arizona Court of Appeals, was designated to sit in his stead.

MOELLER, Justice, dissenting.

I respectfully dissent from the majority's holding that the Navajo Nation is a "state" within the meaning of the Uniform Act. In my view, the only question that needs to be addressed in this case is: Did the Arizona Legislature intend to include the Navajo Nation in its definition of "state" when it enacted the Uniform Act? The parties to this case, the court of appeals, and this court all agree that the answer is "no."

Nevertheless, the majority concludes that the Navajo Nation should now be added to the Uniform Act and considered to be a "state." This holding is apparently based on the majority's speculation that the Arizona Legislature, if asked today, would include the Navajo Nation in the Act. Whether the majority's speculation is correct is wholly beside the point, because the legislature is the only proper body to consider and adopt amendments to its statutes. Statutes, unlike constitutions, are easily amendable by the legislature at any time. In the fifty-four years since Arizona enacted the Uniform Act, the legislature has not seen fit to add the Navajo Nation (or any other Indian tribe or nation) to the Act. The Navajo Nation itself did not see fit to adopt the Act until 1989, when it did so solely to use the Act in this case. In adopting the Act, the Navajo Nation recognized the fallacy of its present argument by expressly including itself by name in the Act, obviously recognizing that the Uniform Act would not otherwise embrace it.

This case is one of statutory construction. It should properly be resolved by applying the plain meaning of the language of the statute. The majority, in my opinion, errs in treating the case as one involving comity, rather than as one involving statutory construction. The majority states that we accepted jurisdiction of this special action because the issue is one "of first impression and involves the question of comity between our state and the separate, sovereign jurisdiction of the Navajo

Nation," at 25, 810 P.2d at 1032, and goes on to state: "In this case, we deal with a tribal law, rather than a judgment," at 34, 810 P.2d at 1041. The fact is that we deal with *no* tribal law. We deal only with a *state* law. If we were to look to tribal law for guidance, and perhaps we should, we would immediately see that the Navajo Nation itself does not consider itself a "state" within the meaning of the Act as enacted by the Arizona Legislature.

When construing a statute, we must ascertain the legislature's true intent *at the time it enacted the statute. Bushnell v. Superior Court,* 102 Ariz. 309, 311, 428 P.2d 987, 989 (1967). That intent is determined by looking at the language of the statute. If that language is plain and unambiguous, leading to only one meaning, we must follow that meaning. *Marquez v. Rapid Harvest Co.,* 89 Ariz. 62, 64, 358 P.2d 168, 170 (1960).

We have often recognized the dangers of judicial legislation:

> The cardinal rule of statutory construction is to ascertain the meaning of a statute and the intent of the legislature at the time the legislature acted. *Putvain v. Industrial Commission,* 140 Ariz. 138, 680 P.2d 1199 (1984); *City of Phoenix v. Superior Court,* 139 Ariz. 175, 677 P.2d 1283 (1984). To arrive at legislative intent, this Court first looks to the words of the statute. *State ex rel. Flournoy v. Mangum,* 113 Ariz. 151, 548 P.2d 1148 (1976).

*Kriz v. Buckeye Petroleum Co.,* 145 Ariz. 374, 377, 701 P.2d 1182, 1185 (1985) (emphasis added).

> The most basic rule of statutory construction is that in construing the legislative language, courts will not enlarge the meaning of simple English words in order to make them conform to their own peculiar sociological and economic views. *Kilpatrick v. Superior Court,* 105 Ariz. 413, 466 P.2d 18 (1970).

*Padilla v. Industrial Comm'n,* 113 Ariz. 104, 106, 546 P.2d 1135, 1137 (1976).

> Courts are not at liberty to impose their views of the way things ought to be simply because that's what must have been intended, otherwise no statute, contract or recorded word, no matter how explicit, could be saved from judicial tinkering.

*Kilpatrick v. Superior Court,* 105 Ariz. 413, 422, 466 P.2d 18, 27 (1970).

Chief Judge Grant's recent opinion in *Begay v. Roberts,* 167 Ariz. 375, 807 P.2d 1111 (App.1990), contains an excellent review of the case law leading to the irrefutable conclusion that the Navajo Nation is a separate, sovereign jurisdiction now, just as it was in 1937. Clearly, the Navajo Nation is not a "state" or a "territory of the United States" in any accepted meaning of those terms. Neither the Navajo Nation nor any other Indian tribe or nation is mentioned in the Uniform Act itself, in any version of the Act enacted in any jurisdiction, in any notes to the Uniform Act, or in any Arizona legislative history relative to the Act. After generations of jurisdictional litigation, it is astounding that the Navajo Nation now argues in state court that it should be considered to be a "state" for purposes of a state statute. It is even more astounding that the majority accepts the argument.

Drifting entirely away from principles of statutory construction, the majority makes much of the supposed advantages accruing to the administration of criminal justice if the Navajo Nation is added to the Act, and of the supposed detriments to the criminal justice system if we do not add the Nation to the Act. But the validity of these arguments, if any, should be determined by the legislature, which is the proper body to consider legislative amendments.

Even if this court were the appropriate forum for the arguments advanced by the majority, the record fails to demonstrate their validity. What the record does show is that for fifty-two years following Arizona's enactment of the Uniform Act, the Navajo Nation saw no need to enact it. When it did so, it did so only for this case. The record shows no single instance in Arizona criminal justice history in which the Act has been used to obtain a witness from the Navajo Nation for a state court prosecution. The legislature, not this

court, should determine whether the Act should be amended to include one, some, all, or none of the Indian tribes and nations.

I am frankly unable to discern the intended scope of today's ruling by the majority. There are hundreds of Indian nations and tribes within the territorial confines of the United States. Some of the majority's language would suggest that *all* Indian nations or tribes in the United States are to be deemed "territories of the United States" for purposes of the Act. *See, e.g.*, at 30, 810 P.2d at 1037, contending that the statute extends to "any territory," and that the Navajo Nation passes "that test" since "it clearly fits the dictionary definition of a 'geographical area' of the United States 'under the jurisdiction of a political authority.'" Other portions of the opinion seem to be case-specific to the Navajo Nation. Whether the opinion covers one, some, or all of the hundreds of Indian tribes or nations within the United States, I reject its rationale because it is not the province of courts to amend statutes on the theory that the legislature would amend them if asked.

Principles of separation of powers and judicial restraint should constrain this court to let the legislature speak for itself on legislative matters. The majority's tour de force of the law of Indians, comity, fifth amendment, territories, and legislative intent cannot obscure the simple fact that the Arizona Legislature did not consider the Navajo Nation to be a state within the meaning of the Act when it adopted the Act. Nor can it obscure the fact that in the fifty-four years since adopting the Act, the Arizona Legislature has not seen fit to add the Navajo Nation to the Act, although it has had abundant opportunity to do so.

In my opinion, the trial court order should be vacated on the jurisdictional ground that the Navajo Nation is not a "state" within the meaning of the Arizona statute. I therefore do not address the several alternative arguments advanced by petitioners.

CAMERON, Justice, concurring.

I concur in Justice Moeller's dissent.