471 A.2d 1141

**In re STATE OF CALIFORNIA FOR the COUNTY OF LOS ANGELES, GRAND JURY INVESTIGATION.**

**No. 1088, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

March 6, 1984.

Certiorari Denied Dec. 27, 1984.

James G. Maggio and H. Robert Scherr, Baltimore, for appellant.

Richard B. Rosenblatt, Asst. Atty. Gen., with whom were Stephen H. Sachs, Atty. Gen., Kurt L. Schmoke, State's Atty., Baltimore City, and Marshall Feldman, Asst. State's Atty., Baltimore City, on brief, for appellee.

Argued Before GILBERT, C.J., and ADKINS and BLOOM, JJ.

GILBERT, Chief Judge.

This Court on October 7, 1983, issued a per curiam order affirming an order by the Circuit Court for Baltimore City (Karwacki, J.) that commanded John Rees to "appear before the Grand Jury of the County of Los Angeles, State of California . . . ."[1] We now explain why we affirmed the Circuit Court.

From the record we learn that the Grand Jury of the County of Los Angeles is inquiring into the unauthorized removal and theft of intelligence information from the

---

1. The Court of Appeals denied certiorari on December 27, 1983, 298 Md. 243, 469 A.2d 452.

Intelligence Division of the Los Angeles Police Department (LAPDID) by Detective Jay Paul (Paul).

There was testimony in the record that Paul, who was assigned to the LAPDID, was under a contractual relationship with Western Goals Foundation in which he was paid thirty thousand dollars a year "to maintain a computer for Western Goals Foundation and develop a computer program to input information in the Western Goals computer." Detective Ben Lovato of the LAPD testified that, "Western Goals is a private intelligence gathering foundation ...." The computer for Western Goals was maintained in the "office of ... Paul's wife, in Long Beach, California."

Apparently Paul would feed information gleaned from the LAPDID records into the Western Goals computer.

The editor of Western Goals, John Rees, allegedly removed from the office of Paul's wife, "thirty discs and one tape which contained" LAPDID "intelligence information." Rees refused to turn over the discs and tape to the LAPDID and left California. Obviously, he made his way to Maryland.

Because the Grand Jury of the County of Los Angeles desired Rees's appearance before it, a subpoena was issued on August 9, 1983, which commanded that Rees present himself before that body on September 29, 1983. In addition to appearing personally before the grand jury, Rees was directed to produce:

"All records of information furnished you or Western Goals by Jay S. Paul or any other Los Angeles Police Department officer or employee, and/or a representative of the office of Ann Love. Such records are not limited to but are to include 30 floppy discs and their printouts, and storage tape and its printouts, received on or about March 11, 1983, from Jay S. Paul, and all other floppy discs and their printouts, all tape cartridges and their printouts, and all other data base information whether stored electronically or otherwise."

Pursuant to the terms of the "Uniform Act to Secure Attendance of Witnesses from Without a State in Criminal Proceedings,"[2] Judge James M. Ideman of the Superior Court for Los Angeles County certified that Rees's presence, together with the discs, tape and printouts, was "necessary, material and relevant to the issues" before the Los Angeles County Grand Jury. Judge Ideman further certified that Rees would be protected "from arrest or service of process, either civil or criminal . . . . "

The judge's certificate, along with the subpoena of the grand jury, was transmitted to Maryland. Rees resisted returning to Los Angeles. The State of California, acting through the state's attorney for Baltimore City, moved pursuant to Md.Cts. & Jud.Proc.Code Ann. § 9–303 to have the Circuit Court for Baltimore City order Rees's appearance before the Los Angeles County Grand Jury. Following a hearing in the circuit court, Judge Karwacki issued that order, and Rees promptly appealed.

Because of the time restraints, we advanced oral argument.

In this Court Rees asserted four reasons why he believed that the order of the circuit court should be reversed. We shall discuss each of the arguments in the order in which Rees posited them to us, adding such additional facts as may be necessary.

## I.

"Under Section 9–302, hearsay evidence is not admissible to prove that appellant is a material and necessary witness."

As we have previously commented, Judge Ideman, a California jurist, certified that Rees and the tangible evidence allegedly possessed by Rees were "material, and relevant to the issues considered by the Los Angeles Grand Jury."

---

2. The Maryland version of this act is codified as §§ 9–301—9–304 of the Courts and Judicial Proceedings Article.

Some States have held that such a certification when supported by an affidavit is itself sufficient to require that the witness be delivered to the requesting State. *See e.g. Epstein v. People of State of New York,* 157 So.2d 705 (Fla.App.1963); *In re Cooper,* 127 N.J.L. 312, 22 A.2d 532 (1941); *Superior Court, State of New Jersey v. Farber,* 94 Misc.2d 886, 405 N.Y.S.2d 989 (1978). *See also Ex parte Armes,* 582 S.W.2d 434 (Tex.Cr.App.1979).

Maryland, in *Appel v. New York,* 243 Md. 218, 220 A.2d 301 (1966), did not decide whether the issuance of the certificate of relevance and materiality was all that was needed, inasmuch as the Maryland hearing judge in *Appel* found from evidence that the witness was "material and necessary" to the New York probe.

In the instant case the certificate of Judge Ideman was bolstered by an affidavit from the deputy district attorney for Los Angeles County that Rees's appearance together with the discs, tape, and printouts was necessary, relevant and material to the grand jury's inquiry into the Western Goals's suspected covert connection to the LAPDID. The testimony of Detective Lovato before Judge Karwacki was largely hearsay, but we think no more than that is required in the instant case.

Courts Art. § 9–302 provides:

"(a) If a judge of a court of record in any state which by its laws has made provision for commanding persons within that state to attend and testify in the State [3] certifies under seal of the court that there is a criminal prosecution pending in the court, or that a grand jury investigation has commenced or is about to commence, that a person being within the State is a material witness in the prosecution, or grand jury investigation, and that his presence will be required for a specified number of days, upon presentation of the certificate to any judge of a court of record, in the county in which the person is, the

---

3. California Penal Code § 1334.2 so provides.

judge shall fix a time and place for a hearing, and shall make an order directing the witness to appear at a time and place certain for the hearing.

(b) If at the hearing the judge determines that the witness is material and necessary, that it will not cause undue hardship to the witness to be compelled to attend and testify in the prosecution or a grand jury investigation in the other state, and that the laws of the state in which the prosecution is pending, or grand jury investigation has commenced or is about to commence, and of any other state through which the witness may be required to pass by ordinary course of travel, will give to him protection from arrest and the service of civil and criminal process he shall issue a summons, with a copy of the certificate attached, directing the witness to attend and testify in the court where the prosecution is pending, or where a grand jury investigation has commenced or is about to commence at a time and place specified in the summons. *In the hearing the certificate shall be prima facie evidence of all the facts stated therein.*" (Emphasis supplied.)

The Maryland Uniform Act to Secure Attendance of Witnesses from Without a State in a Criminal Proceeding is related by rationale and principles of comity to the Uniform Criminal Extradition Act, Md.Ann.Code art. 41, §§ 16–43.[4]

---

**4.** Section 18 of the Extradition statute provides:

"No demand for the extradition of a person charged with crime in another state shall be recognized by the Governor unless in writing alleging, except in cases arising under § 21, that the accused was present in the demanding state at the time of the commission of the alleged crime, and that thereafter he fled from the state, and accompanied by a copy of an indictment found or by information supported by affidavit in the state having jurisdiction of the crime, or by a copy of an affidavit made before a justice of the peace or magistrate there, together with a copy of any warrant which was issued thereupon; or by a copy of a judgment of conviction or of a sentence imposed in execution thereof, together with a statement by the executive authority of the demanding state that the person claimed has escaped from confinement or has broken the terms of his bail, probation or parole. The indictment,

The principal difference is that in the latter the person demanded by the requesting State will be returned to that State to face criminal prosecution, while in the former the person requested is to testify and is specifically exempted from prosecution for matters that "arose before ... entrance into ... [the] State under the summons." Courts Art. § 9–304; California Penal Code § 1334.4.

It has been held in Maryland that the strict rules of evidence are not applicable to extradition proceedings. *Shields v. State,* 257 Md. 384, 263 A.2d 565 (1970); *Johnson v. Warden,* 244 Md. 384, 223 A.2d 584 (1966); *Koprivich v. Warden,* 234 Md. 465, 200 A.2d 49 (1964). 1 Wigmore Evidence § 4 (Tillers rev. 1983) declares, "No jury being involved, extradition proceedings are not governed in strictness by jury trial rules of evidence .... Moreover, here the additional reason obtains that the evidence is brought from outside the jurisdiction, and the procurement of evidence is thus likely to be hampered by lack of power or practicability, as well as by the possible differences of law in another system." (Footnote omitted.)

This Court, speaking through Judge Morton in *Campbell v. State,* 10 Md.App. 406, 413, 271 A.2d 190 (1970), commented, "If we assume that ... [the] affidavit [of the Commonwealth of Virginia's attorney] was based entirely upon hearsay evidence ... we find no violation of [Campbell's] rights." Implicit in that remark is the conclusion that hearsay evidence is admissible in extradition proceedings. What was implicit in *Campbell* is explicit in *In re David,* 395 F.Supp. 803 (E.D.Ill.1975) (hearsay admissible at extradition hearing even though it would not be admissible at trial); *Graham v. Vanderhoof,* 185 Colo. 334, 524 P.2d 611 (1974) (hearsay admissible); *People v. Miller,* 74 Misc.2d 806, 342

information, or affidavit made before the magistrate or justice of the peace must substantially charge the person demanded with having committed a crime under the law of that state; and the copy of indictment, information, affidavit, judgment of conviction or sentence must be authenticated by the executive authority making the demand."

N.Y.S.2d 288 (1973) (issuance of warrant of extradition may be grounded upon hearsay); *President of the United States v. Kelly,* 19 F.Supp. 730 (S.D.N.Y.1937) (properly authenticated depositions or affidavits admissible in evidence in extradition proceeding irrespective of hearsay content); *Klein v. Mulligan,* 50 F.2d 687 (2nd Cir.1931) (that evidence is hearsay is only a "factor to be considered in determining the weight to be accorded it."); *In re LoDolce,* 106 F.Supp. 455 (W.D.N.Y.1952) (statute controlling evidence in extradition proceedings permits hearsay evidence).

■ We are convinced that admission of hearsay in a case involving the attendance of a witness at a criminal trial or before a grand jury in another State is permissible. Such evidence is no more or no less than another factor to be considered in determining whether to grant the requesting State's motion to compel the attendance of the witness.

We hold that Judge Karwacki did not err in receiving that hearsay testimony.

## II.

"The evidence was insufficient to establish that appellant was a material and necessary witness, as required by Section 9–302."

■ Rees's second issue relies heavily on his argument that the hearsay evidence was inadmissible. He obviously reasons that if that evidence is stricken from the record, the remainder, that is the certificate and accompanying affidavit, is insufficient to require his attendance before the Los Angeles Grand Jury. The fallacy in Rees's logic is that the hearsay evidence from Detective Lovato was admissible. Consequently, Rees's contention collapses inasmuch as its foundation has been undermined.

## III.

"The appellant's inability to assert the Maryland Press Shield Privilege, pursuant to Section 9–112, before the Los

Angeles County Grand Jury, is an undue hardship within the meaning of Section 9–302."

Rees seeks to take refuge behind the "Maryland Press Shield Law," Courts Art. § 9–112, which provides:

"A person engaged in, connected with, or employed on a newspaper or journal or for any radio or television station may not be compelled to disclose, in any legal proceeding or trial or before any committee of the legislature or elsewhere, the source of any news or information that was obtained by the person for purposes of publication in a newspaper or journal or for purposes of dissemination by a radio or television station where the person is engaged, connected with or employed."

Rees avers that since he is a Maryland resident he is entitled to the protection of the Maryland act and, therefore, he should not be compelled to disclose the source of the information obtained by him.

■ Aside from the significant fact that the "source" of Rees's information seems to be already known to the Los Angeles Grand Jury, Rees, in his appearance before that august body will have to look to California law for protection,[5] because whatever occurred between Rees and Detective Jay Paul took place in California, not Maryland.

■ The Maryland Press Shield Law was designed to protect newsmen and newswomen in this State; it has no extraterritorial application. The legislature did not enact

---

**5.** *See* California Evidence Code, § 1070(a), which provides:
   "A publisher, editor, reporter, or other person connected with or employed upon a newspaper, magazine, or other periodical publication, or by a press association or wire service, or any person who has been so connected or employed, cannot be adjudged in contempt by a judicial, legislative, administrative body, or any other body having the power to issue subpoenas, for refusing to disclose, in any proceeding as defined in Section 901, the source of any information procured while so connected or employed for publication in a newspaper, magazine or other periodical publication, or for refusing to disclose any unpublished information obtained or prepared in gathering, receiving or processing of information for communication to the public."

the Press Shield Law so as to create a sanctuary to which out-of-state newspersons could flee and thereby avoid disclosure of news sources. Rees's attempted utilization of the Maryland Press Shield Law is disingenuous. We reject it.

## IV.

"Courts Art. § 9–301 *et seq.* does not authorize a Maryland court to issue a summons directing the appellant to produce computer tapes and floppy discs."

Rees's argument relative to the inability of the Los Angeles County Grand Jury to issue a *subpoena duces tecum* for an out-of-state witness is likewise devoid of merit.

Courts Art. § 9–301 provides:

"(a) In this title the following words have the meanings indicated.

(b) 'State' means any state or territory of the United States and the District of Columbia.

(c) 'Summons' means a subpoena, order, or other notice requiring the appearance of a witness.

(d) 'Witness' means a person whose testimony is desired in any proceeding or investigation by a grand jury or in a criminal prosecution or proceeding."

Conspicuously absent from the provision of § 9–301 is the term *subpoena duces tecum.* Inasmuch as the statute does not use that term, Rees concludes that the certifying State is without power to issue such a subpoena. In short, Rees asserts that because the *subpoena duces tecum* is not specifically authorized under the act, its issuance is unauthorized. He employs a slight variance on the old saw, "out of sight is out of mind." [6]

---

6. Arthur Hugh Clough (1819–1861) in "Songs of Absence" (1862).

Although Maryland has not heretofore considered the issue,[7] posed to us by Rees, several of our sister States have had the occasion to pass upon a similar argument.

New Jersey, in *In re Saperstein,* 30 N.J.Super. 373, 104 A.2d 842 (1954), *cert. denied,* 348 U.S. 874, 75 S.Ct. 110, 99 L.Ed. 688, said that "the term 'subpoena' ... embrace[d] *'subpoena duces tecum.'*" *See also Davis v. Lehigh Valley Railroad Co.,* 97 N.J.L. 412, 117 A. 716 (Sup.Ct.1922). In *Application of a Grand Jury of the State of New York,* 8 Mass.App. 760, 397 N.E.2d 686 (1979), the same argument as that made by Rees was before the court. There was a bank upon whom was served a *subpoena duces tecum* from a New York Grand Jury sought to avoid compliance by asserting that the word "summons" as defined in the Uniform Act did not include a "subpoena duces tecum." The Massachusetts court opined:

> "The Uniform Act makes no mention of subpoenas duces tecum or of the power of a court under the Act to order the production of documents. That silence doe snot necessarily imply a rejection of the power. The powers to compel the testimony of a witness and to compel the production of documents are so similar in nature and so fundamental to the gathering of evidence in judicial proceedings that one is hard put to imagine a reason for permitting the former and rejecting the latter; and one suspects that a conscious intention to differentiate between testimonial and documentary evidence would have found some concrete expression in the words of the Act, rather than mere silence. It is not inconceivable that the question of how the Act would relate to the production of documents simply never occurred to the Commissioners on Uniform State Laws. The record of their deliberations can be read as confirming such a suspicion, for we find therein no reference to the production of documents, even

---

**7.** *In re Special Investigation, No. 219,* 52 Md.App. 17, 445 A.2d 1081 (1982), involved a *subpoena duces tecum* issued in Maryland to a citizen of Virginia. The question of the authority of the Grand Jury for Baltimore City to issue such a *subpoena duces tecum* was not decided, although its validity appears to have been assumed.

in passing, much less a discrete subject of discussion. See Handbooks of the National Conference of Commissioners on Uniform State Laws for the years 1915 (at 64–65, 88), 1922 (at 118, 358–361), 1923 (at 78–180), 1924 (at 678–679), 1927 (at 915–918), 1928 (at 430–433), 1929 (at 119–123, 356, 359), 1930 (at 110–113, 575–577), 1931 (at 41–69, 120–122, 417–423), 1932 (at 41), and 1936 (at 96, 100–102, 155–158, 333–338)."

The court, after noting that the general power to subpoena witnesses includes the authority to compel the production of documents, citing, *inter alia, Catty v. Brockelbank,* 124 N.J.L. 360, 12 A.2d 128 (1940), *Marston's Inc. v. Strand,* 114 Ariz. 260, 560 P.2d 778 (1977), *State ex rel. Pollard v. Marion Crim. Ct.,* 263 Ind. 236, 329 N.E.2d 573 (1975), concluded that the Uniform Act should be so interpreted as "to authorize the issuance of *subpoenas duces tecum.*"

Similarly, the Supreme Court of New York in deciding *In re Bick,* 372 N.Y.S.2d 447, 82 Misc.2d 1043 (1975), said that a New Jersey Grand Jury's *subpoena duces tecum* for books, paper, and business records that were located in New York would be honored. The court held that "the term 'subpoena' subsumes a subpoena duces tecum requiring the production of books and records."

Illinois, on the other hand, in *In re Grothe,* 59 Ill.App.2d 1, 208 N.E.2d 581 (1965), held that the Uniform Act does not authorize the issuance of a *subpoena duces tecum.* That Illinois case, however, has since been overruled by statute. *See* 1965 Ill.Laws at 2694 § 1, effective August 6, 1965. *Grothe,* we note, was not followed by the Court of Appeals in *Appel v. New York,* 243 Md. 218, 220 A.2d 301 (1966), and was expressly rejected in *Application of a Grand Jury of the State of New York, supra.*

Patently, the ability to compel Rees, who apparently has possession of certain relevant, material evidence, to appear before the grand jury, but the inability to compel the production of that evidence, borders on the absurd. Unless Rees was able to testify as to the content of discs, a tape,

and printouts, his appearance before the grand jury would be a decided waste.

We believe the weight of authority to be clear. The power to issue a subpoena includes the power to issue a *subpoena duces tecum,* and we so hold.