*In re: Interstate Subpoena for Jamie Leigh Thompson*, No. 1545, Sept. Term 2023.
Opinion by Arthur, J.

**UNIFORM ACT TO SECURE THE ATTENDANCE OF WITNESSES FROM WITHOUT A STATE IN CRIMINAL PROCEEDINGS – ENFORCEABILITY OF SUBPOENA ON OUT-OF-STATE WITNESS**

The Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings is codified in Maryland as Md. Code (1974, 2020 Repl. Vol.), § 9-302(a) of the Courts & Judicial Proceedings Article ("CJP").  To obtain the testimony of an out-of-state witness, a judge from the requesting state must certify, among other things, that the witness is a material witness and that the witness's presence will be required for a specified number of days.  The certification is presented to a court in the witness's state, where a judge determines whether the witness is material and necessary, whether the witness will suffer undue hardship if compelled to attend and testify in the other state, and whether the other state will give the witness protection from arrest and the service of civil or criminal process.  Upon making these findings, the judge must issue a summons directing the witness to testify in the out-of-state proceeding.

In this case, Texas invoked the Uniform Act to obtain an order from a Maryland court, compelling a Maryland resident, who wrote an article for a Texas magazine about a murder that occurred in Texas while she was living and working in Texas, to appear and testify in a criminal proceeding in Texas.  The Maryland resident argued that before the Maryland court compelled her to testify, it must determine whether her testimony would be privileged under the Maryland press shield law (CJP § 9-112) or the Texas press shield law.  The circuit court ruled that the Texas court should determine the issue of privilege and compelled her to testify.

The Appellate Court of Maryland held that, generally, under the Uniform Act, issues of privilege are to be decided in the state in which the criminal proceeding is pending.  The Court distinguished two out-of-state cases that departed from the general rule: *Holmes v. Winter*, 22 N.Y.2d 300, 3 N.E.3d 694, 980 N.Y.S.2d (2013); and *In the Matter of a Motion to Compel*, 492 Mass. 811, 216 N.E.3d 1206 (2023).  In both of those cases, the witnesses had relied on a privilege created by the laws of their home state; and in both of those cases, the home-state privilege was considerably more expansive than any privilege in the state that sought their testimony.  In this case, by contrast, the witness had not relied on Maryland's press shield law when she was living and working in Texas and investigating and writing an article for a Texas-based publication about a murder that occurred in Texas.  Moreover, in both Maryland and Texas, the witness would have a qualified privilege.

Accordingly, the Court held that the circuit court did not err in directing an order compelling the witness's appearance and testimony and directing her to raise privilege issues in Texas.

Circuit Court for Montgomery County
Case No. C-15-CV-23-003039

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 1545

September Term, 2023

_____

IN RE: INTERSTATE SUBPOENA FOR JAMIE
LEIGH THOMPSON

_____

Nazarian,
Arthur,
Eyler, James R.
   (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Arthur, J.

_____

Filed: January 31, 2024

* Berger, J., and Tang, J., did not participate in
the Court's decision to designate this opinion
for publication pursuant to Md. Rule 8-605.1.

This is an expedited appeal from an order compelling Jamie Leigh Thompson, a journalist who currently resides in Maryland, to attend and testify at a criminal trial in Dallas, Texas. We heard oral argument on January 8, 2024. On the following day, we issued an order affirming the judgment of the circuit court and the mandate. This opinion explains the reasons for our ruling.

**BACKGROUND**

Jamie Leigh Thompson has been working as a journalist since 1997. Although her reporting has covered a wide array of topics, a major focus of her work has been crime and law enforcement. Before moving to Maryland in 2018, Thompson lived in Dallas, Texas, where she worked as a contributing editor for *D Magazine*, a monthly publication in the Dallas-Fort Worth area. In addition, she taught journalism at the University of Dallas.

In the fall of 2016, while she was living and working in Texas, Thompson began reporting on the criminal investigation of the murder of Ira Tobolowsky, a Dallas lawyer who was doused with gasoline and set on fire as he was getting into his car to go to work on the morning of May 13, 2016. While writing the article, Thompson communicated with Steven Aubrey, a suspect in Ira Tobolowsky's death. Tobolowsky had represented Aubrey's mother in a series of highly contentious lawsuits that Aubrey brought against her.

On May 1, 2017, *D Magazine* published Thompson's article, which was titled "*A Place Where Something Evil Happened*." The article contains the following passage:

Aubrey declined an interview for this story but did respond to questions over email. "[Dallas Police Detective] Ermatinger is a lying sack of shit," he wrote. Aubrey says his arms were not red when detectives picked him up.[1] He offered a list of Ira's adversaries, asking why those people were never pursued by police. His only connection to Ira, Aubrey says, was a string of lawsuits—just words, no threats. As for the emails to his mother, he says he only threatened to expose her behavior. "I did not say I would physically harm her or anybody," Aubrey wrote. Aubrey says he was not hiding from police after the fire, that he was at the second apartment, and he says the equipment that police found—the drill, plumbing supplies, gas containers—was left over from when he did maintenance on his house in Austin.

"I did not kill Ira, nor do I know who did," Aubrey wrote.[2]

This is the only passage in Thompson's article that quotes Aubrey or refers to her communications with him.

After the publication of the article, Tobolowsky's son, Michael, asked Thompson for all of her email communications with Aubrey. Thompson responded that her practice was to destroy all materials for a piece after its completion. Michael Tobolowsky asked if he could have all of the emails from Aubrey. Thompson gave him a "number of" Aubrey's emails.

---

[1] Aubrey reportedly had red marks on his arms when the police took him in for questioning as a person in interest, shortly after the murder. The article reports that a physician examined Aubrey, but could not determine whether the marks resulted from the flash of a fire, whether they were burns, or whether they were just sunburn.

[2] Jamie Thompson, *A Place Where Something Evil Happened*, D Magazine, May 1, 2017, https://www.dmagazine.com/publications/d-magazine/2017/may/ira-tobolowsky-lawyer-murder-something-evil-happened/ (archived at https://perma.cc/9BUH-3VQV).

On or about April 27, 2022, the State of Texas initiated an arrest warrant against Aubrey for the murder of Ira Tobolowsky. The affidavit that accompanied the arrest warrant stated:

> Also on May 19th, 2016, the Tobolowsky family found a hole drilled in their fence on the back of the property. The hole was drilled then painted over to look like a natural knot in the wood. The hole was in a location that someone could look from the alley and have a direct line of sight at the Tobolowsky garage. The location of the hole was in close proximity to the gate where you could gain access to the backyard and garage. It is believed the hole was created to watch Mr. Tobolowsky and learn his daily routine. The height of the hole was never released.

> *     *     *

> Det. Filingim discovered an email thread between Suspect Aubrey and the author of the D Magazine article, Jamie Thompson, while she was gathering information for her story. During the exchange, Suspect Aubrey made a reference to the height of the hole in the fence. Suspect Aubrey was familiar with the height even though it had never been released publicly in any form.

> On July 27, 2023, Thompson received an email from an Assistant District

Attorney for Dallas County, Texas, asking if she would agree to testify at trial in *State of Texas v. Aubrey*. Thompson declined to testify.

Under the Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings, which has been enacted in every American state, as well as the District of Columbia and the U.S. Virgin Islands,[3] a state may obtain the testimony of an out-of-state witness. To obtain the testimony, a judge in the court in which the

---

[3] Uniform Law Commission, *Attendance of Out-of-State Witness Act*, archived at https://perma.cc/7KJ9-8XTK.

prosecution is pending must certify under seal that a criminal prosecution is pending in that court, that the out-of-state witness is a material witness in the prosecution, and that the witness's presence will be required for a specified number of days. Md. Code (1974, 2020 Repl. Vol.), § 9-302(a) of the Courts & Judicial Proceedings Article ("CJP").

Upon the presentation of this certificate to a judge of a court of record in the county in which the witness is found, that judge must schedule a hearing and must order the witness to appear for the hearing. *Id.* If the judge "determines that the witness is material and necessary, that it will not cause undue hardship to the witness to be compelled to attend and testify" in the proceeding in the other state, "and that the laws of the state in which the prosecution is pending . . . and of any other state through which the witness may be required to pass by ordinary course of travel, will give to the witness protection from arrest and the service of civil and criminal process," the judge must "issue a summons, with a copy of the certificate attached, directing the witness to attend and testify in the court where the prosecution is pending[.]" CJP § 9-302(b).

On August 3, 2023, Judge Hector Garza of the 195th District Court in Dallas County, Texas, issued a certificate to secure Thompson's presence at Aubrey's criminal trial, which was scheduled to begin on September 26, 2023. The certificate asserted that Thompson had given some of the emails that she had exchanged with Aubrey to Michael Tobolowsky and that Michael Tobolowsky had given those emails to the State of Texas. The certificate also asserted that the State of Texas intended to offer the emails as evidence at Aubrey's trial. According to the certificate, Thompson's appearance and testimony were "necessary to authenticate the messages and to fill in the gaps that might

4

exist." The certificate went on to assert that the testimony sought from Thompson "was not available from other sources" and was "central to the prosecution of this matter." The certificate added that Thompson's attendance and testimony would "not cause undue hardship" to her; that the laws of the State of Texas protected her from arrest or service of civil or criminal process arising from any acts committed before she entered the state; and that Texas would arrange and pay for her travel, meals, and lodging expenses.

On August 8, 2023, the State's Attorney for Montgomery County filed a petition with the Circuit Court for Montgomery County on behalf of the State of Texas. In accordance with the Uniform Act, the petition requested an order summoning Thompson to appear and testify at Aubrey's criminal trial, which was scheduled to begin in Dallas on September 26, 2023. The certificate from the Texas court supported the petition.

On August 28, 2023, Thompson filed an opposition to the petition.

On September 7, 2023, the Circuit Court for Montgomery County held a hearing regarding the request for the order directing Thompson to testify in the Texas trial. At the hearing, Thompson argued that, before compelling her to attend and testify at the trial in Texas, the court should determine whether she had a privilege not to testify under the Maryland or Texas press shield law. Following this Court's decision in *In re State of California for the County of Los Angeles, Grand Jury Investigation*, 57 Md. App. 804 (1984) ("*L.A. Grand Jury*"), the circuit court ruled that Thompson must present her privilege claims to the Texas court. Accordingly, the court issued an order compelling

5

Thompson to appear and testify at the trial in *Texas v. Aubrey*, beginning September 26, 2023.[4]

On October 6, 2023, Thompson noted an appeal. On October 21, 2023, the parties agreed to file a joint notice of expedited appeal, pursuant to Maryland Rule 8-207(b).

Meanwhile, in late September 2023, the trial in *Texas v. Aubrey* was postponed until January 29, 2024. On October 20, 2023, the State's Attorney for Montgomery County filed a new petition for an order summoning Thompson to appear and testify on the new trial date. The petition was accompanied by another certificate and motion from Texas.

On January 9, 2024, after oral argument in this case but before this Court had issued the mandate affirming the judgment, the circuit court compelled Thompson to appear and testify at the trial in *Texas v. Aubrey*, beginning January 29, 2024.

This Court affirmed the judgment on January 9, 2024. On that same day, the mandate was issued.

Three days later, on January 12, 2024, the State of Texas moved to dismiss the criminal case against Aubrey "for further investigation." The motion stated that the prosecution was "unable to make a prima facie case at this time." The Texas court granted the motion on that same day.

---

[4] In the circuit court, Thompson made a number of other arguments, including arguments based on the First Amendment to the United States Constitution and Article 40 of the Maryland Declaration of Rights. The court rejected all of her arguments. On appeal, Thompson complains only of the court's decision to allow the Texas court to decide the privilege issues.

6

Thompson raises a single issue on appeal: "Whether the circuit court erred by issuing an order compelling Thompson to testify in *Texas v. Aubrey* without applying Maryland's or Texas' Shield Law."

Before we decide that issue, we must decide whether we should refrain from deciding the case on the ground that it is moot. For the reasons stated below, we conclude that the case is moot, but that it is capable of repetition and is likely to evade appellate review. Thus, the case falls within an exception to the general rule against deciding moot cases.

On the merits, we hold that the circuit court did not err in compelling Thompson to attend and testify at Aubrey's criminal trial in Texas pursuant to the Uniform Act. Thompson does not enjoy protection under the Maryland press shield law for news reporting that she conducted while in Texas. If Thompson contends that she has a privilege not to testify or not to answer certain questions at some future trial, she may present her arguments to the Texas court.[5]

**MOOTNESS**

The only order that is currently before us is the one that compelled Thompson to appear and testify at a trial that was supposed to begin on September 26, 2023.

---

[5] The Texas press shield law has a statutory mechanism to address questions of privilege before trial. Tex. Code Crim. Proc., art. 38.11, § 6. *D Magazine*, which published Thompson's article, and a local television station invoked that statutory mechanism in filing motions to quash subpoenas that the State of Texas has served on them in connection with the *Aubrey* prosecution.

Technically, that order is moot: a court cannot compel Thompson to appear and testify at a trial that was supposed to take place more than three months ago, in a criminal case that is no longer pending. *D.L. v. Sheppard Pratt Health Sys., Inc.*, 465 Md. 339, 351-52 (2019) (quoting *In re Kaela C.*, 394 Md. 432, 452 (2006)) (stating that, "[g]enerally, a case is moot . . . 'when the court can no longer fashion an effective remedy'").

Ordinarily, an appellate court should not decide moot questions. *See State v. Ficker*, 266 Md. 500, 506-07 (1972) (stating that "[a]ppellate courts do not sit to give opinions on abstract propositions or moot questions"); *accord Cottman v. State*, 395 Md. 729, 744 (2006). A court, however, may decide moot questions that are capable of repetition, but will evade review. *See*, *e.g.*, *La Valle v. La Valle*, 432 Md. 343, 352 (2013).

This case presents a paradigmatic example of a question that is capable of repetition, but will evade appellate review. After the Texas court rescheduled the trial, Texas sought and obtained a second order compelling Thompson to appear and testify on the new trial date of January 29, 2024. The circuit court issued that order on January 9, 2024, the day after oral argument in this appeal. The parties had no time to brief, argue, and decide an appeal from the circuit court's second order. Moreover, the issues on appeal in this case are almost certainly identical to the issues that would have been raised in an appeal from that order.

The dismissal of the criminal charges does not compel a different result. The Texas court did not dismiss the charges until three days after this Court had issued its mandate. Thus, the dismissal could not possibly have affected a decision that had already

8

been made. Nor did the dismissal relieve us of the obligation to explain the bases for the decision that we made before the Texas case was dismissed. In any event, the dismissal is without prejudice: the State dismissed the charges for "further investigation" because it said that it could not prove a prima facie case "at this time." In these circumstances, it is entirely conceivable that the State may reinstitute the charges at some later date and reinvoke the procedures under the Uniform Act to compel Thompson to testify in Texas.

For these reasons, we shall proceed to discuss the merits of the case.

### DISCUSSION

In general, under the Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings, issues of privilege are to be decided in the state in which the criminal proceeding is pending. *See*, *e.g.*, *Tracy v. Superior Court*, 168 Ariz. 23, 43-44, 810 P.2d 1030, 1050-51 (1991); *Johnson v. O'Connor ex rel. County of Maricopa*, 235 Ariz. 85, 93, 327 P.3d 218, 226-27 (Ct. App. 2014); *Matter of Rhode Island Grand Jury Subpoena*, 414 Mass. 104, 109, 605 N.E.2d 840, 844 (1993); *Codey v. Capital Cities, American Broadcasting Corp.*, 82 N.Y.2d 521, 529-30, 626 N.E.2d 636, 642, 605 N.Y.S.2d 661, 667 (1993); *see also Matter of Motion to Compel*, 492 Mass. 811, 813, 216 N.E.3d 1206, 1211 (2023); *Holmes v. Winter*, 22 N.Y.3d 300, 313, 3 N.E.2d 694, 703, 980 N.Y.S.2d 357, 366 (2013); *but see People v. Marcy*, 91 Mich. App. 399, 407, 283 N.W.2d 754, 757 (1979) (holding that a Michigan polygrapher was not a "material and necessary witness" in a criminal case in Delaware, because his testimony was privileged under Michigan law).

As the New York Court of Appeals explained:

9

> It would be inefficient and inconsistent with the over-all purpose and design of this reciprocal statutory scheme to permit the sending State's courts to resolve questions of privilege on a CPL 640.10(2)[6] application. The purpose of the Uniform Act was to establish a simple and consistent method for compelling the attendance of out-of-State witnesses . . . . This goal would be frustrated if the CPL 640.10(2) hearings conducted by the sending State were to become forums for the litigation of questions of admissibility and evidentiary privilege, most of which will inevitably have to be litigated again anyway during the course of the demanding State's criminal proceeding.

*Codey v. Capital Cities, American Broadcasting Corp.*, 82 N.Y.2d at 529-30, 626 N.E.2d at 642, 605 N.Y.S.2d at 667 (citation omitted); *accord Matter of Rhode Island Grand Jury Subpoena*, 414 Mass. at 109, 605 N.E.2d at 844 ("[h]olding otherwise would unnecessarily duplicate judicial determination of privilege claims").

Moreover, "[w]hether a particular communication or document is entitled to the cloak of privilege is a complex question that requires a balancing of values and policy choices . . . ." *Codey v. Capital Cities, American Broadcasting Corp.*, 82 N.Y.2d at 530, 626 N.E.2d at 642, 605 N.Y.S.2d at 667. Ordinarily, therefore, "evidentiary questions such as privilege are best resolved in the State—and in the proceeding—in which the evidence is to be used." *Id.* at 530, 626 N.E.2d at 642, 605 N.Y.S.2d at 667.

In *L.A. Grand Jury*, this Court reached a conclusion that comports with the general rule. In fact, the Supreme Court of Arizona cited *L.A. Grand Jury* in support of its conclusion that privilege issues "are a matter for the requesting jurisdiction to rule on and

---

[6] "CPL 640.10(2)" refers to New York Criminal Practice Law 640.10(2), which is New York's version of the Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings.

are not appropriately addressed to the state court issuing the subpoena." *Tracy v. Superior Court*, 168 Ariz. at 43, 810 P.2d at 1050.

In *L.A. Grand Jury*, California employed the Uniform Act to obtain the grand jury testimony of John Rees, a Maryland resident who had allegedly received information that a police detective had stolen from the Los Angeles Police Department. *In re L.A. Grand Jury*, 57 Md. App. at 807-08. Rees, a journalist, complained that if he were required to testify in California, he would suffer "undue hardship" within the meaning of the Uniform Act, because he would be unable to assert the protections of the Maryland press shield law (*id.* at 812-13), which prevented him from being compelled to disclose his sources. *See id.* at 813. This Court rejected Rees's complaint, asserting that he would "have to look to California law for protection, because whatever occurred between [him] and [the detective] took place in California, not Maryland." *Id.* (footnote omitted). The Court added:

> The Maryland Press Shield Law was designed to protect newsmen and newswomen in this State; it has no extraterritorial application. The legislature did not enact the Press Shield Law so as to create a sanctuary to which out-of-state newspersons could flee and thereby avoid disclosure of news sources. Rees's attempted utilization of the Maryland Press Shield Law is disingenuous. We reject it.

*Id.* at 813-14.

*L.A. Grand Jury* would seem to compel the conclusion that Thompson must "look to [Texas] law for protection, because whatever occurred between [her] and [Aubrey] took place in [Texas], not Maryland." *Id.* at 813. Thompson argues, however, that the General Assembly "abrogated" *L.A. Grand Jury* when it amended the press shield law in

11

1988. Thompson is incorrect: the 1988 amendments expanded the protections of the press shield law, but they had no effect on *L.A. Grand Jury*'s conclusion that the statute has no extraterritorial application.

When this Court decided *L.A. Grand Jury*, the Maryland press shield law provided as follows:

> A person engaged in, connected with, or employed on a newspaper or journal or for any radio or television station may not be compelled to disclose, in any legal proceeding or trial or before any committee of the legislature or elsewhere, the source of any news or information that was obtained by the person for purposes of publication in a newspaper or journal or for purposes of dissemination by a radio or television station where the person is engaged, connected with or employed.

Md. Code (1974, 1984 Repl. Vol.), § 9-112 of the Courts and Judicial Proceedings Article.

Thus, before the 1988 amendments, the press shield law protected journalists only from being compelled to disclose a source. On its face the privilege was absolute, but the statute did not address whether journalists could be compelled to disclose a source (or to confirm the identity of a source) if that information had become public. Nor did the law address whether journalists could be compelled to disclose their work product—i.e., information that they had gathered in the course of their work, but had not communicated to the public.

In the years leading up to the 1988 amendments, Maryland courts addressed both of those issues. In *Tofani v. State*, 297 Md. 165, 174-75 (1983), the Court held that a journalist had waived the protection of the press shield law and could be compelled to confirm the identity of her sources because she disclosed their identities in a published

news article.  In *WBAL-TV Division, The Hearst Corp. v. State*, 300 Md. 233, 243-44 (1984), the Court assumed, without deciding, that the First Amendment and Article 40 of the Maryland Declaration of Rights recognized "a qualified privilege to withhold unpublished material obtained during the news gathering process."  Under the qualified privilege, the right to withhold unpublished material would yield if the journalist had relevant information, if the information was unavailable from another source outside of the news media, and if the government had a compelling and overriding interest in its disclosure.  *WBAL-TV Division, The Hearst Corp. v. State*, 300 Md. at 243.

The 1988 amendments addressed both of these judicial decisions, but said nothing about *L.A. Grand Jury*.

First, the amendments expanded the absolute privilege against the disclosure of confidential sources by stating that "the protection from compelled disclosure under this section is not waived" if a journalist[7] "disseminates a source of any news or information,

---

[7] We use the term "journalist" as a surrogate for the large class of people whom the amended statute protects.  Subsection (b) of the amended statute states that its protections apply to any person who is, or has been:

      (1) Employed by the news media in any news gathering or news disseminating capacity;

      (2) An independent contractor of the news media acting within the scope of a contract in any news gathering or news disseminating capacity; or

      (3) Enrolled as a student in an institution of postsecondary education and engaged in any news gathering or news disseminating capacity recognized by the institution as a scholastic activity or in conjunction with an activity sponsored, funded, managed, or supervised by school staff or faculty.

or any portion of the news or information procured" while pursuing a news-gathering or news-disseminating activity. CJP § 9-112(e). According to the Floor Report for Senate Bill 87, which proposed the 1988 amendments, this portion of the legislation "specifically addresses the ruling" in *Tofani*.[8] More specifically, it overrules *Tofani*.

---

CJP § 9-112(b).

Subsection (a) of the amended statute defines the term "news media" to mean:

(1) Newspapers;

(2) Magazines;

(3) Journals;

(4) Press associations;

(5) News agencies;

(6) Wire services;

(7) Radio;

(8) Television; and

(9) Any printed, photographic, mechanical, or electronic means of disseminating news and information to the public.

CJP § 9-112(a).

[8] Floor reports are among the "'General Assembly documents most likely to reflect actual legislative purpose[.]'" *Logan, Trustee Under Harold A. Logan Trust Agreement Dated April 30, 2007 v. Dietz*, 258 Md. App. 629, 669 n.10 (quoting Jack Schwartz & Amanda Stakem Conn, *The Court of Appeals at the Cocktail Party: the Use and Misuse of Legislative History*, 54 Md. L. Rev. 432, 462 (1995)), *cert. denied*, 486 Md. 221 (2023).

Second, the amendments codified a qualified privilege, much like the qualified privilege discussed in *WBAL-TV*, for a journalist's work product.[9] Under the amended statute, the qualified privilege must yield if a court finds that the party seeking the work product has established, by clear and convincing evidence, that:

> (i) The news or information is relevant to a significant legal issue before any judicial, legislative, or administrative body, or anybody that has the power to issue subpoenas;
>
> (ii) The news or information could not, with due diligence, be obtained by any alternate means; and
>
> (iii) There is an overriding public interest in disclosure.

CJP § 9-112(d)(1).[10]

---

[9] We use the term "work product" as a surrogate for the materials protected by the statute, which include:

> (i) Notes;
>
> (ii) Outtakes;
>
> (iii) Photographs or photographic negatives;
>
> (iv) Video and sound tapes;
>
> (v) Film; and
>
> (vi) Other data, irrespective of its nature, not itself disseminated in any manner to the public.

CJP § 9-112(c)(2).

[10] In addition to stipulating that a person cannot waive the absolute privilege not to disclose sources and codifying the qualified privilege pertaining to work product, the 1988 amendments expanded the press shield law to cover former journalists. *See Telnikoff v. Matusevitch*, 347 Md. 561, 589 (1997).

The 1988 amendments did not address the question of whether a Maryland court should apply the Maryland press shield law to prevent journalists from being compelled to testify in another state about their journalistic activities in the other state. The stated purpose of the amendments, however, was to "promote the overall freedom of this State's gatherers and disseminators of information" (1988 Md. Laws ch. 113, preamble)—which certainly seems to imply that the purpose was not to protect persons who gathered or disseminated information outside of "this State." Contrary to Thompson's arguments, therefore, the 1988 amendments did not "abrogate" *L.A. Grand Jury*. *L.A. Grand Jury* remains good law. Thompson must "look to [Texas] law for protection, because whatever occurred between [her] and [Aubrey] took place in [Texas], not Maryland." *In re L.A. Grand Jury*, 57 Md. App. at 813; *accord* 6 Lynn McClain, *Maryland Evidence* § 516:1 (Sept. 2023 update) (stating that "[t]he Maryland statute does not protect out-of-state journalists, at least with regard to their out-of-state activities, who have subsequently come to Maryland").[11]

---

[11] In an effort to rebut *L.A. Grand Jury*'s statement that the Maryland press shield law "has no extraterritorial application," Thompson cites *Bogard Construction Inc. v. Oil Price Information Service, LLC*, 604 F. Supp. 3d 895 (N.D. Cal. 2022). *Bogard* does not support Thompson's contentions. In *Bogard*, a party served a federal deposition subpoena on a price-reporting agency in Maryland. *Id.* at 901. The agency moved to quash the subpoena in federal court in Maryland. *Id.* The Maryland court transferred the motion to quash to the Northern District of California, where the underlying litigation was pending. *Id.* at 901. Under federal choice-of-law principles, the California court was required to apply the forum state's choice-of-law rules. *Id.* at 900 (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)). The court treated Maryland as the forum (*id.* at 901), applied Maryland's choice-of-law rules (*id.*), and concluded that Maryland's choice-of-law rules required the application of the Maryland press shield statute. *Id.* at 901-02. The only similarity between the *Bogard* case and this case is that both mention the Maryland press shield statute.

Thompson responds that "public policy" precludes a court from compelling testimony under the Uniform Act.  She cites two cases for that proposition: *Holmes v. Winter*, 22 N.Y.3d 300, 3 N.E.3d 694, 980 N.Y.S.2d 357 (2013); and *In the Matter of a Motion to Compel*, 492 Mass. 811, 216 N.E.3d 1206 (2023).  Neither case supports the conclusion that the circuit court erred in compelling Thompson, who investigated and wrote an article for a Texas-based publication, about a murder in Texas, while she was working as a journalist in Texas, from presenting her privilege arguments to a Texas court.

In *Holmes v. Winter*, 22 N.Y.3d 300, 3 N.E.3d 694, 980 N.Y.S.2d 357 (2013), the New York Court of Appeals recognized what it called a "narrow exception"[12] to the general rule that "a claim that the evidence sought will be inadmissible in the demanding state based on the applicability of a privilege is simply not a proper basis for a sending state . . . to deny the subpoena request under the Uniform Act."  *Id.* at 313, 3 N.E.3d at 702-03, 980 N.Y.S.2d at 365-66.

In that case, Winter, a journalist based in New York, had published an article that discussed privileged communications between the person who was accused of committing the mass shooting at a movie theater in Aurora, Colorado, and his psychiatrist.  *Id.* at 303, 3 N.E.3d at 695, 980 N.Y.S.2d at 358.  The article attributed the information about the communications to "two unidentified law enforcement sources."

---

[12] *Id.* at 318, 3 N.E.3d at 706, 980 N.Y.S.2d at 369.

17

*Id.* Colorado employed the Uniform Act in an attempt to compel Winter to identify her sources.

Under New York's press shield law, Winter had an absolute privilege to refuse to disclose her sources. *Id.* at 303, 3 N.E.3d at 695, 980 N.Y.S.2d at 358. Under Colorado law, by contrast, Winter had only a qualified privilege. *Id.* at 314, 3 N.E.3d at 703, 980 N.Y.S.2d at 366. "[T]he only purpose of requiring Winter to appear in Colorado [was] to compel her to reveal the identities of the individuals who supplied the information she reported in the news story—information obtained in exchange for a promise of confidentiality." *Id.* at 315, 3 N.E.3d at 704, 980 N.Y.S.2d at 367; *see id.* at 316, 3 N.E.3d at 704, 980 N.Y.S.2d at 367 ("the only purpose for Winter's testimony is to ascertain who leaked the information"). Thus, Winter made "a compelling argument that the promise of confidentiality she provided to her sources [would] not be honored by the Colorado courts." *Id.* at 314, 3 N.E.3d at 703, 980 N.Y.S.2d at 366.

The New York court stressed that, "as a New York reporter, Winter was aware of—and was entitled to rely on—the absolute protection embodied in [New York's] Shield Law when she made the promises of confidentiality that she now seeks to honor." *Id.* at 316, 3 N.E.3d at 704, 980 N.Y.S.2d at 367. Because of her reliance on New York's absolute privilege, and because of "the significant disparity between New York and Colorado law," the court asserted that "she was entitled to have the Shield Law issue adjudicated in New York before the subpoena was issued, even though it relates to testimony sought in the courts of another state." *Id.* at 316, 3 N.E.3d at 704-05, 980 N.Y.S.2d at 367-68. The court concluded that "an order from a New York court directing

18

a reporter to appear in another state where, as here, there is a substantial likelihood that she will be compelled to identify sources who have been promised confidentiality would offend our strong public policy—a common-law, statutory and constitutional tradition that has played a significant role in this State becoming the media capital of the country if not the world." *Id.* at 316, 3 N.E.3d at 705, 980 N.Y.S.2d at 368.

In the judgment of the New York court, those circumstances justified a "narrow exception" to the general rule that issues of privilege are to be decided in the state in which the criminal proceeding will occur. *Id.* at 318, 3 N.E.3d at 706, 980 N.Y.S.2d at 369. Because the exception is "difficult to meet" and "will rarely be applicable," the New York court did "not anticipate" that its holding would "be interpreted as an erosion of the doctrine of comity or as otherwise significantly impairing the procedure for securing the attendance of out-of-state witnesses." *Id.* at 319, 3 N.E.3d at 707, 980 N.Y.S.2d at 370.

The Supreme Judicial Court of Massachusetts followed *Holmes v. Winter* in *In the Matter of a Motion to Compel*, 492 Mass. 811, 216 N.E.3d 1206 (2023). In that case, Rhode Island employed the Uniform Act in an effort to compel a rape crisis center in Massachusetts to produce records concerning an alleged victim of child sexual-abuse in Rhode Island. *Id.* at 813-14, 216 N.E.3d at 1212.

Under Massachusetts law, "sexual assault counselling records are presumptively privileged." *Id.* at 817, 216 N.E.2d at 1215.[13] "The State of Rhode Island," by contrast,

---

[13] Under Massachusetts law, the holder of the records is entitled to advance notice and an opportunity to be heard on questions of privilege and relevance before the

"does not specifically privilege sexual assault counselling records." *Id.* at 820, 216 N.E.2d at 1217.[14]

In evaluating whether a Massachusetts court should compel the rape crisis center to produce the victim's records in Rhode Island, the court "acknowledge[d] the continuing validity of" the "general rule," that "privilege issues are 'a matter for the requesting jurisdiction to rule on and are not appropriately addressed to the [S]tate court issuing the subpoena.'" *Id.* at 819, 216 N.E.3d at 1216 (quoting *Matter of Rhode Island Grand Jury Subpoena*, 414 Mass. 104, 109, 605 N.E.2d 840, 844 (1993)) (further citation omitted). The court held, however, that Massachusetts's "strong and clear public policy in favor of protecting victims of sexual assault compels an exception" to the general rule. *Id.*

In reaching that decision, the court expressly stated that it was "persuaded by the analysis of the New York Court of Appeals in *Holmes v. Winter*." *Id.* at 820, 216 N.E.3d

_____

issuance of a summons. *Id.* at 818, 216 N.E.3d at 1215. The Massachusetts privilege yields only upon a particularized showing of necessity. *See id.* at 817-18, 216 N.E.3d at 1215. Even then, the records must "be kept by the clerk under seal." *Id.* at 818, 216 N.E.3d at 1215. And, ordinarily, counsel for the moving party may not copy the records or even disclose them to their client, the criminal defendant. *Id.* at 818-19, 216 N.E.3d at 1215-16. A violation of that obligation would subject an attorney to disciplinary action. *Id.* at 818, 216 N.E.3d at 1216.

[14] Rhode Island did not provide for advance notice to the holder of the records. *Id.* at 820-21, 216 N.E.3d at 1217. A Rhode Island court could conduct an in camera review of the records to decide the issue of privilege, while a Massachusetts court typically could not. *Id.* at 821, 216 N.E.3d at 1217-18. Most important, Rhode Island did not require that the records be kept under seal or that counsel generally be prohibited from copying them or disclosing them. *Id.* at 821, 216 N.E.3d at 1218.

20

at 1217. Thus, like the New York court, the Massachusetts court "stress[ed]" the "limited nature of the holding." *Id*. The court added that "'the narrow exception we recognize today . . . is not tantamount to giving a [Massachusetts] law extraterritorial effect,' and does not offend principles of comity." *Id*. (quoting *Holmes v. Winter*, 29 N.Y.3d at 318, 3 N.E.3d at 706, 980 N.Y.S.2d at 369).

The facts of *Holmes v. Winter* and *In the Matter of a Motion to Compel* are a bit different from those of this case. In *Holmes v. Winter*, a New York-based journalist relied on the protections of New York's press shield law when she published an article containing information that she had received from a confidential source. Similarly, in *In the Matter of a Motion to Compel*, a rape crisis center in Massachusetts relied on the protections of Massachusetts's privilege for sexual assault counselling records when it counseled the alleged victim of child sexual-abuse. In both cases, the local laws on which the witnesses relied—the press shield law in New York and the privilege for sexual assault counselling records in Massachusetts—afforded considerably greater protection than did the laws of the state where their testimony was sought.

Here, by contrast, Thompson could not possibly have relied on the Maryland press shield law when she was a Texas-based reporter, investigating a crime that occurred in Texas for a Texas-based magazine; to the contrary, she could only have relied on Texas law. Moreover, on the issues that are pertinent to this case—a journalist's right to refuse to disclose work product—Maryland and Texas both afford only a qualified privilege.

21

CJP § 9-112(d)(1); Tex. Code Crim. Proc. art. 38.11, § 5.[15] In these circumstances, we see no reason to depart from the general rule that under the Uniform Act issues of privilege are to be decided in the state in which the criminal proceeding is pending.[16]

---

[15] Under Maryland law, a court may compel a journalist to produce work product if the party seeking the work product establishes, by "clear and convincing evidence," that:

   (i) The news or information is relevant to a significant legal issue before any judicial, legislative, or administrative body, or anybody that has the power to issue subpoenas;

   (ii) The news or information could not, with due diligence, be obtained by any alternate means; and

   (iii) There is an overriding public interest in disclosure.

CJP § 9-112(d)(1).

   Under Texas law, a court may compel a journalist to produce work product if the party seeking the work product "makes a clear and specific showing" that:

   (1) all reasonable efforts have been exhausted to obtain the information from alternative sources; and

   (2) the unpublished information, document, or item:

      (A) is relevant and material to the proper administration of the official proceeding for which the testimony, production, or disclosure is sought and is essential to the maintenance of a claim or defense of the person seeking the testimony, production, or disclosure; or

      (B) is central to the investigation or prosecution of a criminal case and based on something other than the assertion of the person requesting the subpoena, reasonable grounds exist to believe that a crime has occurred.

Tex. Code Crim. Proc. art. 38.11, § 5(a).

The State of Maryland, arguing for affirmance, adduces an additional reason why the Texas court should decide the issues of privilege. Thompson does not claim an absolute privilege to refuse to testify. Instead, under Maryland law and Texas law, she has, at most, a qualified privilege not to disclose certain specific items of information. In these circumstances, a court will have to decide the issue of privilege on a question-by-question basis. It would be "inefficient" for a Maryland court to conduct a mini-trial on the issue of privilege only to have a Texas court decide the issue again if the Maryland court compelled the witness to testify in Texas. *Codey v. Capital Cities, American Broadcasting Corp.*, 82 N.Y.2d at 529-30, 626 N.E.2d at 642, 605 N.Y.S.2d at 667.

Finally, Thompson contends that she is not a "material and necessary witness," within the meaning of the Uniform Act, because, she says, her testimony is barred by privilege. Her argument misapprehends the concepts of materiality, necessity, and privilege. "Evidence is material if it bears on a fact of consequence to an issue in the case." *Smith v. State*, 218 Md. App. 689, 704 (2014). "'[N]ecessary' evidence is evidence that is useful, legally significant and noncumulative." *Codey v. Capital Cities, American Broadcasting Corp.*, 82 N.Y.2d at 528-29, 626 N.E.2d at 641, 605 N.Y.S.2d at

---

[16] We need not decide whether the same result would obtain if another state, which affords considerably less protection than Maryland, sought to compel the testimony of a journalist who had relied on the Maryland press shield law. *See Codey v. Capital Cities, American Broadcasting Corp.*, 82 N.Y.2d at 530 n.3, 626 N.E.2d at 642 n.3, 605 N.Y.S.2d at 667 n.3 (1993) (recognizing the possibility that, "in some future case a strong public policy of this State, even one embodied in an evidentiary privilege, might justify the refusal of relief under [the Uniform Act] even if the 'material and necessary' test set forth in the statute is satisfied").

666.  "Neither term subsumes the entirely separate concept of 'privilege,' which pertains to the disclosability and admissibility of otherwise probative and useful evidence."  *Id.* at 529, 626 N.E.2d at 641, 605 N.Y.S.2d at 666 (citations omitted).  Thus, Thompson may be a "material and necessary witness," within the meaning of the Uniform Act, even if a Texas court ultimately determines that some or all of her testimony is privileged.

In summary, the circuit court did not err in compelling Thompson to appear and testify at Aubrey's criminal trial in Texas.  If Texas seeks her testimony, Thompson may present her claims of privilege to the Texas court.